Raymond D. HICKS, M.D., Plaintiff-Appellee,

v.

TALBOTT RECOVERY SYSTEM, INC. a.k.a. Talbott Marsh Recovery System or Talbott Marsh Recovery Center, Anchor Hospital, Barry H. Lubin, M.D., G. Douglas Talbott, M.D., Defendants-Appellants.

No. 98-8821.

United States Court of Appeals,

Eleventh Circuit.

Nov. 22, 1999.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-cv-2963-MHS), Marvin H. Shoob, Judge.

Before TJOFLAT and BIRCH, Circuit Judges, and BRIGHT[*], Senior Circuit Judge.

BIRCH, Circuit Judge:

This appeal concerns the validity of an alcoholic, physician patient's release used by an addiction recovery facility to send to a state medical licensing board psychiatric and psychological treatment records, including sensitive sexual disclosures. The jury rendered a verdict in the physician's favor, and the district judge denied post-trial motions for judgment as a matter of law and a new trial. We affirm.

*I. BACKGROUND*

In October, 1993, plaintiff-appellee, Dr. Raymond D. Hicks, was employed as an internist by Baylor University Medical Center ("Baylor") in Dallas, Texas, in both its Employee Health Clinic and its Senior Health Center Clinics, where he was Associate Director. When a patient reported smelling alcohol on his breath and after investigation, Dr. Hicks was required to obtain treatment for his admitted alcohol abuse by the Baylor administrative authorities. His staff privileges at the Baylor clinics were not revoked; Dr. Hicks was placed on a medical leave of absence.

---

[*]Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

For his alcoholism treatment, Dr. Hicks selected defendant-appellant Talbott Marsh Recovery System, Inc. ("Talbott Marsh")[1] in College Park, Georgia. He was admitted to affiliated Anchor Hospital ("Anchor") on October 11, 1993, with admission diagnoses of alcohol and nicotine dependencies. Regarding nonchemical addictions, it was noted in his admission history that Dr. Hicks "may have a problem with a sexual compulsion as manifested by several affairs." Joint Exhibit 16 (Anchor Hospital/Talbott Marsh Recovery System Admission History and Physical Examination, Oct. 11, 1993). Anchor's "Patient's Rights" represented that Dr. Hicks's privacy would be respected and that his treatment records were confidential.[2] An initial neuropsychological evaluation revealed that Dr. Hicks had some cognitive impairment that was attributed to his alcohol abuse. Because alcoholism was identified as Dr. Hicks's primary problem, evaluation and potential treatment of any sexual addiction was deferred until his alcohol abuse was under control.[3]

---

[1]In 1975, Dr. G. Douglas Talbott founded Talbott Marsh specifically to treat physicians suffering from chemical and other addictions, such as food and sex, that impair competency and judgment. By involving family members, employers, and appropriate others in the treatment program, the philosophical/treatment objective of Talbott Marsh is to help a physician "begin a program of recovery from the disease of chemical dependence and return to his/her family and profession." Joint Exhibit 14 (brochure describing the Talbott Marsh Recovering Physicians Program). The affiliation of Talbott Marsh with Anchor Hospital provides the evaluation and care of a full-service general hospital in assisting with its addictive disease intervention, including detoxification and stabilization. Over 3,000 physicians have been treated at the facility. *See id.* Talbott Marsh also is known as Talbott-Marsh Recovery System, Inc., Talbott Marsh Recovery System, or Talbott Marsh Recovery Center.

[2]Anchor's Patient's Rights, adopted from those of the American Hospital Association, provide in pertinent part:

> The patient has the right to every consideration of his privacy concerning his own medical care program. Case discussion, consultation, examination, and treatment are confidential and should be conducted discreetly.
>
> ....
>
> The patient has the right to expect that all communication and records pertaining to his care should be treated as confidential.

Joint Exhibit 16 (Anchor Hospital Patient's Rights at WW 5-6, signed by Dr. Hicks on Oct. 11, 1993).

[3]During his physical assessment, Dr. Hicks developed chest pains, which resulted in his return to Dallas for further treatment from his cardiologist there. His October 20, 1993, Anchor discharge summary lists his

2

Following his initial evaluation, Dr. Hicks was discharged from Anchor on November 4, 1993, for immediate transfer and residence at proximate Talbott Marsh for his therapeutic treatment. His Anchor discharge summary states final diagnoses of alcohol and nicotine dependencies and dysthymic disorder or depression. For the first time, under the psychological/psychiatric assessment, the discharge summary states that Dr. Hicks had a history of affairs and sex with prostitutes and that he had described his sexual problems as compulsive.

Upon his admission to Talbott Marsh, Dr. Hicks signed two agreements that also were signed by a Talbott Marsh staff member and relate to this case. The first was a Talbott Recovery System Patient Rights agreement, which affirmed the confidentiality of his treatment records,[4] and the second was the Talbott

_____

final diagnoses as alcohol and nicotine dependencies as well as dysthymic disorder or depression. He was re-admitted to Anchor on October 24, 1993, with an admitting diagnosis of alcohol dependence.

[4]The Talbott Marsh patient's rights agreement states:

> YOU HAVE THE RIGHT ...
>
> ....
>
> To reasonably expect, from staff members responsible for your care and welfare, complete and current information concerning your condition, diagnosis, treatment, and prognosis in terms and language you can understand, unless it's medically inadvisable to give you that information and so documented in your medical record;
>
> ....
>
> To respect of, and privacy for, your therapy program. Case discussions, consultations, examinations, and treatment are confidential and should be conducted discreetly;
>
> ....
>
> To be assured confidential treatment of your personal and medical records, you may approve or refuse their release to any individual outside of Talbott Recovery System, Inc. except as otherwise provided by law or a third party payment contract, or in the case of your transfer to another health care institution....

Joint Exhibit 17 at 1, 2, WW 2, 5, 15 (Talbott Recovery System Patient Rights, signed by Dr. Hicks on Nov. 4, 1993).

Recovery System Patient's Responsibilities agreement, which required him to participate in his treatment program actively and candidly.[5]

On November 4, 1993, Dr. Hicks also signed in conjunction with a Talbott Marsh staff member a patient orientation agreement stating the parameters of the confidentiality of his treatment records. That document specifies that federal law protects the confidentiality of the treatment records of Talbott Marsh patients and that those records cannot be released absent an authorized release by the patient, a court order, or disclosure to medical personnel in special circumstances, such as a medical emergency.[6] The

---

[5]The Talbott Marsh patient's responsibilities agreement states:

> YOU HAVE THE RESPONSIBILITY ...
>
> To be honest about matters that relate to you as a patient;
>
> To attempt to understand your problem;
>
> To attempt to follow the directives and advise offered by the staff;
>
> ....
>
> To comply with the policies and expectations of the Program;
>
> To take an active part in your treatment program....

Joint Exhibit 17 at WW 1-3, 11-12 (Talbott Recovery System Patient's Responsibilities, signed by Dr. Hicks on Nov. 4, 1993).

[6]The Talbott Marsh confidentiality agreement for patient records, which is part of patient orientation, provides:

> The confidentiality of alcohol and drug abuse patient records maintained by Talbott-Marsh Recovery System, Inc. is protected by Federal law and regulations. Generally, Talbott-Marsh Recovery System,Inc. may not say to a person outside the program that a patient attend[ed] the program, or disclose any information identifying a patient as an alcohol and/or drug abuser *unless:*
>
> > 1. the patient (or parent in the case of a minor) completes a Talbott-Marsh Recovery System "Authorization and Consent to Release Information" form;
> >
> > 2. the disclosure is allowed by a court order;  or
> >
> > 3. the disclosure is made to medical personnel in a medical emergency or to

4

confidentiality agreement further states that only a criminal act or a potential criminal act by a patient is unprotected by federal law shielding patient confidentiality.

In a letter dated December 15, 1993, Sharon Pease, Senior Investigator for the Texas State Board of Medical Examiners ("Texas Board"), informed Dr. Hicks that she had been assigned to investigate his "admitted problem with alcohol abuse." Joint Exhibit 3. In addition to commending him for entering treatment for his alcoholism, she requested additional information specifically about his alcohol abuse[7] and requested that he complete an enclosed release of his Talbott Marsh treatment records. Dr. Hicks sought the advice of defendant-appellant Dr. Barry H. Lubin, Director of Continuing Care at Talbott Marsh, in responding to the request for his treatment records by the Texas Board. Dr. Lubin was the Talbott Marsh staff

---

qualified personnel for research, audit, or program evaluation.

Violations of the Federal law and regulations by a program is a crime. Suspected violations may be reported to appropriate authorities in accordance with Federal regulations.

Federal law and regulations do not protect any information about a crime committed by a patient either at the facility or against any person who works for the facility or about any threat to commit such a crime.

Federal laws and regulations do not protect any information about suspected child abuse or neglect from being reported under State law to appropriate State or local authorities.

Joint Exhibit 17 (Talbott-Marsh Recovery System, Inc. Confidentiality of Alcohol and Drug Abuse Patient Records, signed by Dr. Hicks on Nov. 4, 1993).

[7]Pease's letter requested that Dr. Hicks provide answers to the following questions concerning his alcohol abuse:

1. What is your anticipated discharge date for this treatment?

2. Have you ever been treated for alcohol or drug abuse in the past; if so, when, and where?

3. Describe your alcohol use and how it affected your practice.

4. According to your letter, you admitted to alcohol use while caring for patients at the Senior Living Center; please explain this in detail.

Joint Exhibit 3.

5

member responsible for advising physician patients on communications and issues with their respective state licensing boards.

When he met with Dr. Lubin, Dr. Hicks completed the Texas Board release authorization and specified that his treatment records that were to be sent to the Texas Board were for "11 Oct 93 to present." Joint Exhibit 4 at 2 (Appendix A). He signed the release on January 3, 1994, for Dr. G. Douglas Talbott, as the record custodian, to provide the requested records. Dr. Lubin testified that he knew that the Talbott Marsh records coordinator would need a Talbott Marsh release rather than the Texas Board release to send Dr. Hicks's treatment records to the Texas Board, and he asked Dr. Hicks to sign a Talbott Marsh release. While this Talbott Marsh release also could be revoked in writing at any time, it differed from the Texas Board release in that, without revocation, it was effective to release all of Dr. Hicks's treatment records for one year from the date that he signed it.

Instead of signing the release of Dr. Hicks's Talbott Marsh treatment records to his state medical licensing board as only a witness, Dr. Lubin and his assistant completed the release of Dr. Hicks's treatment records to Sharon Pease of the Texas Board *for* Dr. Hicks for the purpose of "Continuing Care." Joint Exhibit 5 (Appendix B). With vertical slash marks that cover all categories of possible information, including "Psychiatric/Psychological" records, this release, as completed by Dr. Lubin, was effective to send *all* of Dr. Hicks's Talbott Marsh treatment records to Pease at the Texas Board for one year from the date of Dr. Hicks's signature. *Id.* Dr. Lubin admitted that:

> when Dr. Hicks said it wasn't his handwriting on some of that form, it wasn't. It was mine. I did it. Most physicians don't do those things. I did.
>
> ....
>
> I wrote Continuing Care. I made the slash marks. I put his name on top.
>
> My assistant did chart number, social security number and birth date. My assistant I believe did both dates of January 3rd, 94....
>
> ....

6

My slash marks, my intention when I made those slash marks w[as] to release [Dr. Hicks's] entire record because that's what the [Texas] Board requested.

R6-140, 141.

Additionally, Dr. Lubin testified that he "assumed" that Dr. Hicks understood that he was signing a prospective release for treatment records to be created in the future. R7-156. The record does not show that Dr. Lubin reviewed Dr. Hicks's Talbott Marsh treatment records prior to advising him concerning the release of those records or completing the Talbott Marsh release for him. Dr. Lubin, the Talbott Marsh staff member specifically responsible for advising physician patients regarding issues relating to their state licenses, testified that state licensing boards are more sensitive to sexual issues than they are to chemical dependency issues. Nevertheless, he also testified that he did not believe that he discussed with Dr. Hicks "the concerns that one would have if a Board was privy to psychosexual information as opposed to just alcohol and drug information," although Dr. Hicks's sexual compulsion was noted in his patient history.[8] R7-164. Because the Talbott Marsh prospective release encompassed not only treatment records that existed on the date that the patient signed it but also those produced for a year from that date, Dr. Hicks's Talbott Marsh release as completed by Dr. Lubin was operative to send his treatment records to Sharon Pease at the Texas Board for the next year, which included his subsequent evaluations and potential treatment for his sexual compulsion. Nonetheless, Dr. Lubin did not explain this aspect of the Talbott Marsh release to Dr. Hicks, even though Dr. Hicks had specified in his handwriting on the Texas Board release that his treatment records could be sent

---

[8]At trial, Dr. Lubin agreed that the Talbott Marsh policy that a patient's disclosure of information was valid only if the patient was informed so that he understood the specific information requested and the benefits and disadvantages of releasing that information was a "fine policy." R7-163.

to the Texas Board only through January 3, 1994,[9] and the Texas Board had requested treatment records relating solely to his alcoholism.[10]

In contrast to Dr. Lubin's view of the requested release of treatment records, Dr. Hicks testified that, based on his designated limitation on the Texas Board release, that he

> authorized Talbott Marsh to release information they had regarding my treatment from 11 October 93 which was the date of my admission to Anchor Hospital to the present time which I perceived to be the date 1-3-1994, and I believed that that was the only information that I was allowing them to release, either by this form or by the other form which you have seen.

R6-58. When shown the Talbott Marsh release purportedly executed by him on January 3, 1994, Dr. Hicks could identify only his signature and testified that the "other handwriting" and "slash marks" on the release were not his. *Id.* He testified that he did not recognize the Talbott Marsh release being "in its current form when I signed it." *Id.* at 59. Significantly, Dr. Hicks did not realize that the Talbott Marsh release was prospectively operative for one year:

> That was not my understanding at all. My understanding of this was that the Texas Board needed to know something about my treatment, and that Dr. Lubin was a person whom I contacted about this, that *Dr. Lubin was aware of the issues that I was dealing with, and that he would, it was my understanding that he would not send anything which would be harmful to me.*

*Id.* (emphasis added).

---

[9]We note that the Talbott Marsh release, unlike the release from the Texas Board, provided a category entitled "Other (Please specify): _____," wherein Dr. Hicks could specify precisely what treatment records were to be sent to the Texas Board in accordance with their request as he had done on the Texas Board release. *Compare* Joint Exhibit 5 (Appendix B) *with* Joint Exhibit 4 at 2 (Appendix A).

[10]Ironically, Dr. Lubin had a similar situation to that of Dr. Hicks. Dr. Lubin, who also was an internist, had had cocaine, sex, and eating addictions. In 1990, he entered Talbott Marsh for treatment of these addictions, but he did not disclose them to his state licensing board. Dr. Lubin never had his medical license suspended or revoked, and he was not investigated by his state licensing board concerning any of his dependencies. Following his treatment, Dr. Lubin was employed by Talbott Marsh. Dr. Lubin acknowledged at trial that he "most definitely" could empathize with Dr. Hicks:

> One of the reasons that I like many other people employed in the recovery field are good at what we do is because we have been where the patients who are sitting there and have been able to get sober, get into recovery and live a quality of life far better than I ever thought I could have before.

R7-273-74.

Rather than responding to the specific questions regarding Dr. Hicks's alcoholism that Sharon Pease of the Texas Board had requested in her December 15, 1993, letter to Dr. Hicks, Dr. Lubin sent her a letter dated January 6, 1994, that only verified that Dr. Hicks was admitted to Anchor/Talbott Marsh on October 11, 1993, and that he was being treated for chemical dependence with no established discharge date. Dr. Lubin represents in his letter that it was written at Dr. Hick's request and with his permission. Yet, no copy to Dr. Hicks is shown.

By the end of January, 1994, Dr. Hicks had progressed sufficiently in his treatment for his primary problem, alcoholism, that a full evaluation of his secondary problem, sexual compulsion, could be accomplished for the purpose of determining a course of treatment.[11] Dr. Richard R. Irons, a psychiatrist specializing in the evaluation and treatment of sexual disorders, performed a psychosexual assessment of Dr. Hicks. During that evaluation, Dr. Irons learned that Dr. Hicks's consensual sexual relationships with various individuals included patients. Dr. Irons documented Dr. Hicks's revelations in progress notes that became a part of Dr. Hicks's Talbott Marsh patient history.

In a letter dated February 1, 1994, the Texas Board requested Dr. Hicks's Talbott Marsh medical records within two weeks so that a complaint alleging a violation of the Medical Practice Act could be evaluated.[12] At that time, the only information that the Texas Board had from Talbott Marsh concerning Dr. Hicks was Dr. Lubin's January 6, 1994, letter. Dr. Hicks again went to see Dr. Lubin for advice in responding to this letter, and he testified that he "was quite concerned because the information regarding my psychosexual problems had been discussed with Dr. Irons." R6-62.

Dr. Lubin called in his assistant and dictated a responsive letter to Sharon Pease in Dr. Hicks's presence. That letter states that Dr. Hicks was transferred to Talbott Marsh on November 4, 1993, for

[11]As part of his treatment for sexual addiction, Dr. Hicks signed a "Celibacy Contract," which was co-signed by a staff member.

[12]This letter is addressed to "G. Douglas Hicks, MD." On the Texas Board release authorization, Dr. Hicks designated Dr. G. Douglas Talbott as the Talbott Marsh records custodian. Apparently, the names were merged inadvertently.

9

treatment of his chemical dependence and that he was cooperating with the treatment program; no copy to Dr. Hicks is shown. Dr. Lubin also asked Dr. Hicks to complete another Talbott Marsh release. Although the release was the same form that Dr. Hicks had signed before, the information to be sent pursuant to this February 24, 1994, release was different. This time, Dr. Hicks checked only the "Correspondence" category and specified "letter from B. Lubin," which was for the purpose of "Informing the State Board of treatment to date." Joint Exhibit 7 (Appendix C). Dr. Hicks testified that he specifically asked Dr. Lubin if anything other than the dictated letter would be sent to the Texas Board, and Dr. Lubin replied: "That's it."[13] R6-64. Furthermore, after his psychosexual evaluation with Dr. Irons had commenced, Dr. Hicks asked Cliff Tillery, his primary therapist with whom he had group therapy, whether any of the psychosexual information would be sent to the Texas Board, and Tillery said that it would not be reported to the Texas Board but that Dr. Hicks needed to attend sexual addiction classes.[14]

Subsequently, Dr. Irons and Tillery determined that Dr. Hicks needed to go to a facility specializing in sexual addiction to deal with that problem. Dr. Hicks chose Charter Hospital ("Charter") in Plano, Texas,

---

[13]Dr. Hicks described this meeting with Dr. Lubin in his affidavit, when he

> expressed concern about the release of information. In order to reassure me, Dr. Lubin allowed me to listen as he dictated a very narrow letter to the Texas Board regarding my treatment for alcoholism. *Thus, I was reassured that that would be the only information released to the Texas Board. I certainly believed that Dr. Lubin, as a licensed medical doctor, was well aware of the necessity of confidentiality.*

R1-1-Exhibit A at 3, ¶ F (affidavit of Raymond D. Hicks, M.D.) (emphasis added).

[14]The same representation was made in a group therapy session by Dr. G. Douglas Talbott, founder and director of Talbott Marsh:

> During one inpatient support group therapy session in late December of 1993, the inpatient group was discussing a certain Texas physician's situation regarding the disclosure of sexual issues and the problems that he would encounter if the Texas Board were to be made aware of that information. In that session, *Dr. G. Douglas Talbott, the medical director of Talbott Marsh, represented that Talbott Marsh would never send information regarding sexual problems to the Texas State Board of Medical Examiners.*

R1-1-Exhibit A at 3, ¶ E (affidavit of Raymond D. Hicks, M.D.) (emphasis added).

10

to be near his home while being treated for his sexual addiction. Dr. Hicks was discharged from Talbott Marsh for transfer to Charter on March 19, 1994, with final diagnoses of alcohol and nicotine dependencies, dysthymic disorder, and psychosexual disorder with addictive features. Following his treatment at Charter for sexual addiction, he was to return to Talbott Marsh for final discharge.

The Texas Board sent a March 28, 1994, letter requesting Dr. Hicks's treatment records that was identical to the February 1, 1994, letter, except that this letter was addressed to Dr. G. Douglas Talbott and stamped "Second Request." Joint Exhibit 10. Pursuant to this request, Carolyn Perkins, the Talbott Marsh medical records coordinator, copied and sent *all* of Dr. Hicks's treatment records, including his psychosexual therapy with Dr. Irons, to the Texas Board on April 1, 1994, based upon the January 3, 1994, Talbott Marsh release signed by Dr. Hicks but completed by Dr. Lubin and his assistant.[15] Although Perkins, who did not have a degree or accreditation as a medical records technician or administrator, testified that she regularly sought the advice of Dr. Lubin and medical records supervisors regarding the particular treatment records to send pursuant to a request for a patient's records, she consulted no one before sending Dr. Hicks's entire treatment records to the Texas Board. She testified that, because the January 3, 1994, release was signed by Dr. Lubin as the witnessing staff member, she "assum[ed]" that he had discussed the release with Dr. Hicks.[16] R7-215. Dr. Hicks was not informed by Perkins or anyone at Talbott Marsh that his entire medical records had been sent to the Texas Board.

---

[15]In accordance with Talbott Marsh policies, Perkins testified that her handwriting appears on the top of the March 28, 1994, request for treatment records from the Texas Board and notes that Dr. Hicks's records were sent to the Texas Board on April 1, 1994. *See* R7-223; Joint Exhibit 10. She also testified that the vertical slash marks covering all of the categories of information relating to a patient's medical records indicated that the entire medical records for the specified patient were to be sent to the specified individual or entity. *See* R7-218.

[16]Perkins even testified that she recalled copying a specific page of Dr. Hicks's medical records that stated that, among his psychosocial stressors, were possible loss of his job and medical license. *See* R7-209. Yet, she consulted no one before sending *all* of his Talbott Marsh treatment records to the Texas Board, which licensed Dr. Hicks to practice medicine.

11

After receiving all of Dr. Hicks's Talbott Marsh medical records, Sharon Pease visited him while he was at Charter for treatment of his sexual addiction. She informed him that the Texas Board was aware that he had engaged in sex with patients, which was revealed in his Talbott Marsh treatment records. Dr. Hicks was "totally stunned" because he understood from Dr. Irons and Tillery that his psychosexual records would not be transmitted to the Texas Board, since its interest was in his treatment for alcoholism.[17] R6-73.

Pursuant to a subpoena obtained by the Texas Board, Charter, with no notice to Dr. Hicks, sent all of his psychosexual treatment records from that facility to the Texas Board approximately eleven weeks after Talbott Marsh had sent its medical records for Dr. Hicks.[18] Similar to the Talbott Marsh records relating to Dr. Hicks's treatment for his psychosexual disorder, the Charter records disclosed that Dr. Hicks's sexual addiction had included sex with patients. Following its investigation into Dr. Hicks's professional conduct, the Texas Board issued on August 19, 1994, an order specifying the conditions of his practice of medicine in Texas to which Dr. Hicks agreed. These restrictive terms included limiting his practice to institutional settings, being monitored by a physician acceptable to the Texas Board, requiring a chaperone to be present for examination of all female patients, and submitting a copy of the order to all hospitals in which he had

---

[17]After learning from Pease that the Texas Board had all of his Anchor/Talbott Marsh medical records, Dr. Hicks

> requested Anchor and Talbott Marsh to produce a copy of documents which they had sent to the Texas State Medical Board, and to my surprise, the medical file reflected communications between me and my physicians and counselors during the five month period I had been at Anchor and Talbott Marsh. In addition, the documents included communications between me and my family and the family therapist disclosed during family therapy sessions.

R1-1-Exhibit A at 4, ¶ I (affidavit of Raymond D. Hicks, M.D.).

[18]Dr. Hicks refused to sign a medical records release for his treatment at Charter.

privileges.[19]  Dr. Hicks's signing this Agreed Order, a public record, was the only way that the Texas Board

would permit him to retain his medical license.[20]

---

[19]Ironically, before his discharge from the Talbott Marsh recovery program, Dr. Hicks was required to sign a re-entry contract in which he, his referring employer/physician, and his Talbott Marsh therapists agreed to the manner in which he would conduct his medical practice.  This re-entry contract not only contained many of the same terms as that of the Texas Board, such as continuing treatment for his addictions and mandating that a monitor be present for all patient examinations and interactions, but also went further by requiring Dr. Hicks to establish a recovery network, including his wife, program director, monitor, and sexual addiction therapist.  The first condition of the re-entry contract was Dr. Hicks's admission that he suffers from a psychosexual disorder and his commitment to abstain from specific behaviors in his personal and professional life.  His Professional Re-Entry Plan, organized in phases, as well as a Relapse Prevention Plan were formulated during Dr. Hicks's residence at Talbott Marsh and were an instrumental part of his recovery program.

This *non-public* contract had to be accepted by any employer of Dr. Hicks.  Therefore, his former or any potential employer would be fully apprised of his addictions, his participation in the Talbott Marsh recovery program, and the cumulative decision of his therapists and referring hospital/physician that he was ready to resume his practice of medicine under delineated circumstances, including continuing therapy for his addictions.  Talbott Marsh additionally has periodic reassessments of its patients following discharge.

[20]Dr. Hicks testified that "it was my perception that it was either I sign this Agreed Order with these terms and conditions, or that I lose my license entirely.  Those were the two choices." R6-82.  An important purpose of the re-entry contract as well as the Texas Board Agreed Order was to preclude Dr. Hicks from being in situations that might be compromising to patients.  Because of the *public* nature of the Agreed Order, however, Dr. Hicks's chances of finding employment were significantly less than with the similar non-public, re-entry contract.  Hospitals and clinics, many of which provide malpractice insurance for their physicians, are reluctant to have a staff doctor with a public order noting conduct that may subject the medical facility to liability.

Although the Agreed Order and his re-entry contract were similar in the restrictions placed on his medical practice, Dr. Hicks testified as follows on cross-examination regarding the detrimental effect of the Agreed Order in contrast to the re-entry contract in his obtaining employment as a physician:

I believe that presenting a public document with that kind of information on it to a prospective employer would preclude my obtaining employment.

....

And [with the re-entry contract] I would have had Dr. Irons advocating for me and working with me with the prospective employer.

....

I believe they [prospective employers] were prejudiced by this Board Order.

Following his discharge from Charter on May 6, 1994, Dr. Hicks was under the care and treatment of his referring psychiatrist specializing in addictions in Dallas, and he attended Alcoholics Anonymous and sexual addiction programs there. On October 24, 1994, Dr. Hicks was re-admitted to Talbott Marsh to be evaluated regarding overcoming his alcohol and sexual addictions for the purpose of re-entering his medical practice. As stated in Dr. Hicks's Talbott Marsh reassessment performed on October 25, 1994, his alcohol dependence and his sexual disorder were "in remission," and his dysthymic condition was "under treatment" with medication. Joint Exhibit 17 at 342, 343. The evaluating staff psychiatrist made the following assessment and recommendation:

> This man [Dr. Hicks] has a good program of recovery going for him and *I personally would give him advocacy to return to the practice of medicine.* He is looking at doing some consultations for [his referring psychiatrist specializing in addictions] and probably will be able to break into the practice of medicine quite slowly. He needs to be cautioned about working more than 40 hours a week for the first year of returning to practice. *Again, I would advocate for his returning to the practice of medicine.*

*Id.* at 343 (emphasis added).

Dr. Hicks was discharged from Talbott Marsh on October 29, 1994, as a sufficiently recovered patient to re-enter his medical practice. His primary therapist, Tillery, and Dr. Irons, his sexual addiction psychiatrist, signed his discharge summary, which states as his final diagnoses: "Alcohol dependence" and "Paraphilia with addictive, exploitive features." *Id.* at 299. The final assessment was that Dr. Hicks "appears committed to practicing an ongoing program of recovery and is willing to utilize the support available for him at home." *Id.* In his capacity as Director of Continuing Care, Dr. Lubin wrote Dr. Hicks's referring

---

> ....
>
> Because it is a public document.
>
> ....
>
> Because it can be read by anyone who wants to read it, and it could cause prospective employers problems should a problem arise in the future.
>
> R6-111,112-13. With either the Agreed Order or his re-entry contract, the public, or future patients, were protected by the supervisory requirements.

14

psychiatrist specializing in addictions and with whom Dr. Hicks would continue his recovery therapy a letter on October 31, 1994, and informed him that Dr. Hicks had completed his program and had been discharged from Talbott Marsh. Dr. Lubin further informed this doctor that Dr. Hicks "has been cleared to return to practice according to Board Order and with recommendations from Dr. Richard Irons" and that, in his Continuing Care Contract, Dr. Hicks identified this doctor as his "primary monitoring professional." *Id.* at 363.

Despite his clearance from Talbott Marsh to re-enter his medical practice under rigidly specified conditions, Dr. Hicks could not return to his former job at Baylor because of the requirements of the public, Texas Board order. Dr. Hicks's attempts to locate employment at any other hospital in the immediate Dallas area also were unsuccessful. The only medical employment that he was able to find anywhere proximate to his residence and continuing therapy was a temporary contract job in a state prison 150 miles from his home. The commuting, work, and substantially reduced income made this job unworkable after three months. Because of his unemployment and the expenses associated with maintaining his medical license with the Texas Board, Dr. Hicks eventually relinquished it. Loss of his livelihood caused him deep depression and emotional upheavals.

On November 17, 1995, Dr. Hicks sued Talbott Marsh, Anchor, Dr. Lubin, and Dr. Talbott in federal court in the Northern District of Georgia. His complaint, based on diversity jurisdiction, alleged federal and state causes of action, including negligence, breach of fiduciary duty, breach of contract, invasion of privacy, and wrongful disclosure of privileged information. He sought $10,000 in general and compensatory damages and $1,000,000 in special damages for lost wages and earning capacity.[21]

Following trial, the jury returned a verdict in favor of Dr. Hicks in the amount of $200,000. Talbott Marsh moved for judgment as a matter of law or, alternatively, for a new trial. The district judge denied these motions. Talbott Marsh and Dr. Lubin appeal these denials and pursue their supporting arguments.

---

[21]Dr. Hicks's combined salary from the two Baylor clinics at the time that he went into treatment for his alcoholism was $150,000 annually.

15

*II. ANALYSIS*

A.      *Judgment as a Matter of Law*

Appellants argue that judgment as a matter of law should have been granted to them with respect to sending Dr. Hicks's treatment records relating to his psychosexual therapy to the Texas Board because he signed the Talbott Marsh release that encompassed those records. We review the denial of a motion for judgment as a matter of law *de novo* and apply the same standards used by the district court. *See Montgomery v. Noga,* 168 F.3d 1282, 1289 (11th Cir.1999). The evidence supporting the verdict is considered in favor of the nonmoving party as are all reasonable inferences. *See id.*

Georgia law protects as privileged confidential communications between a psychiatrist[22] or licensed psychologist[23] and a patient. *See* O.C.G.A. §§ 24-9-21(5) & (6), 43-39-16; *Wiles v. Wiles,* 264 Ga. 594, 448 S.E.2d 681, 682 (Ga.1994). For these privileges to attach, the patient voluntarily must have sought the assistance of the psychiatrist or psychologist. *See Bobo v. State,* 256 Ga. 357, 349 S.E.2d 690, 691 (Ga.1986); *In re L.H.,* 236 Ga.App. 132, 511 S.E.2d 253, 257-58 (Ga.Ct.App.1999); *cf. Christenson v. State,* 261 Ga. 80, 402 S.E.2d 41, 46 (Ga.1991) (recognizing that these privileges are inapplicable when the psychiatrist or psychologist is appointed by the court to examine the patient). Additionally, these confidentiality privileges exist only when professional treatment was given or contemplated. *See Manning v. State,* 231 Ga.App. 584, 499 S.E.2d 650, 651 (Ga.Ct.App.1998) (recognizing that the psychiatrist-patient and psychologist-patient privileges materialize only when a professional relationship was "actually

---

[22]The Georgia Supreme Court has defined "psychiatrist" in O.C.G.A. § 24-9-21(5) broadly to mean "a person licensed to practice medicine, or reasonably believed by the patient so to be, who devotes a substantial portion of his or her time engaged in the diagnosis and treatment of a mental or emotional condition, including alcohol or drug addiction." *Wiles v. Wiles,* 264 Ga. 594, 448 S.E.2d 681, 684 (Ga.1994). The court explained that "[t]his definition protects the communications of the patient who seeks treatment for mental disorders from a medical doctor with the expectation that the communications will be confidential." *Id.*

[23]Georgia law considers the privilege between a licensed psychologist and patient to be equivalent to that of an attorney and client: "The confidential relations and communications between a licensed psychologist and client are placed upon the same basis as those provided by law between attorney and client; and nothing in this chapter shall be construed to require any such privileged communication to be disclosed." O.C.G.A. § 43-39-16.

16

contemplated or formed or psychological treatment rendered"). Unless waived, these confidentiality privileges are absolute. *See Scroggins v. State,* 237 Ga.App. 122, 514 S.E.2d 252, 254 (Ga.Ct.App.1999).

"The object of the [psychiatrist-patient] privilege is to encourage the full trust of the patient so as to persuade him to reveal his innermost feelings and private acts so that the psychiatrist may give the most effective treatment."[24] *Mrozinski v.Pogue,* 205 Ga.App. 731, 423 S.E.2d 405, 408 (Ga.Ct.App.1992). This privilege protects "not merely words spoken, but 'disclosures made in confidence.' " *Id.* at 409 (citation omitted). "[A]s a matter of public policy, psychiatrist-patient communications are to be privileged and are to remain privileged *even though* the patient's 'care and treatment or the nature and extent of his injuries (have been put) at issue in any civil or criminal proceeding.' " *Plunkett v. Ginsburg,* 217 Ga.App. 20, 456 S.E.2d 595, 597 (Ga.Ct.App.1995) (quoting O.C.G.A. § 24-9-40(a)). Thus, "Georgia law has an exceedingly strict view as to what are privileged 'communications' " with respect to disclosures made by a patient to a treating psychiatrist.[25] *Mrozinski,* 423 S.E.2d at 409.

---

[24]The Georgia Supreme Court recognized that

> [c]ommunications between a psychiatrist and patient are protected because "most psychiatric analysis and treatment must come from the mind of the patient." As one treatise explains:
>
> > "Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication.... A threat to secrecy blocks successful treatment."

*Wiles,* 448 S.E.2d at 683 (citations omitted) (omission in original).

[25]Emphasizing the strength of the psychiatrist-patient privilege, the Georgia Supreme Court has stated:

> The psychiatrist-patient privilege is not waived when a party who claims it is seeking to recover damages for injuries of a mental and emotional nature. The privilege is not waived when a third party is present, who is an necessary or customary participant in the consultation and treatment. Nor is the privilege waived when the person claiming it has made disclosures in separate, unrelated actions.

*Bobo,* 349 S.E.2d at 691 (citations omitted).

17

Concomitantly, Georgia law considers a relationship confidential "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith." O.C.G.A. § 23-2-58; *Parello v. Maio,* 268 Ga. 852, 494 S.E.2d 331, 333 (Ga.1998). "[S]ome confidential relationships are created by law, some by contract, and others may be created by the facts of a particular case." *Trulove v. Woodmen of the World Life Ins. Soc'y,* 204 Ga.App. 362, 419 S.E.2d 324, 327 (Ga.Ct.App.1992). "All the law requires is the showing of a relationship in fact which justifies the reposing of confidence in one party by another." *Remediation Servs., Inc. v. Georgia-Pacific Corp.,* 209 Ga.App. 427, 433 S.E.2d 631, 635 (Ga.Ct.App.1993). Because "a party to a confidential or fiduciary relationship may rely upon representations made" therein, *Dover v. Burns,* 186 Ga. 19, 196 S.E. 785, 789 (Ga.1938), such a relationship of "utmost good faith and loyalty" is breached and damages are recoverable when the fiduciary uses information provided in the confidential relationship to the detriment of the one to whom the duty is owed, *Tante v. Herring,* 264 Ga. 694, 453 S.E.2d 686, 688 (Ga.1994).

Since the psychiatrist-patient privilege is absolute, it "cannot be waived, absent some express intentional act to do so" by the patient. *Jones v. Abel,* 209 Ga.App. 889, 434 S.E.2d 822, 824 (Ga.Ct.App.1993); *see Freeman v. State,* 196 Ga.App. 343, 396 S.E.2d 69, 70 (Ga.Ct.App.1990). In keeping with the strong public policy that is the impetus for the psychiatrist-patient and psychologist-patient privileges, the relevant Georgia statute in pertinent part likewise protects psychiatric and psychological records:

> A clinical record for each patient shall be maintained. *Authorized release of the record* shall include but not be limited to examination of the original record, *copies of all or any portion of the record,* or disclosure of information from the record, *except for matter privileged under the laws of this state.* Such examination shall be conducted on hospital premises as determined by the facility. *The clinical record shall not be a public record and no part of it shall be released except:*
>
> > *A copy of the record may be released to any person or entity designated in writing by the patient ....*

18

O.C.G.A. § 37-7-166(a)(1) (emphasis added). This statute prohibits the "disclosure of clinical records of patients receiving treatment in hospitals for substance abuse"; the only way that these records can be released is when "such a designation was made *in writing* by the patient." *Mrozinski,* 423 S.E.2d at 410; *see* 42 U.S.C. § 290dd-2(b)(1) (permitting the disclosure of substance abuse treatment records of patients "with the prior written consent of the patient"); 42 C.F.R. pt. 2, § 2.3 & subpt. C (1993)[26] (permitting the disclosure of alcohol and drug abuse treatment records "with written patient consent").[27] " '*Waiver is a voluntary*

---

[26]Subpart C states the requisite elements of a written consent for a patient's release of treatment records:

> A *written consent to a disclosure* under these regulations must include:
>
> (1) The specific name or general designation of the program or person permitted to make the disclosure.
>
> (2) The name or title of the individual or the name of the organization to which disclosure is to be made.
>
> (3) The name of the patient.
>
> (4) The purpose of the disclosure.
>
> (5) *How much and what kind of information is to be disclosed.*
>
> (6) *The signature of the patient ....*
>
> (7) The date on which the consent is signed.
>
> (8) A statement that the consent is subject to revocation at any time except to the extent that the program or person which is to make the disclosure has already acted in reliance on it.
>
> ....
>
> (9) The date, event, or condition upon which the consent will expire if not revoked before. This date, event, or condition must insure that the consent will last no longer than reasonably necessary to serve the purpose for which it is given.

> 42 C.F.R. subpt. C, § 2.31 (emphasis added).

[27]The relation of the federal regulations to those of a state are as follows:

> The statutes authorizing these regulations do not preempt the field of law which they cover to the exclusion of all State laws in that field. If a disclosure permitted under these

19

*relinquishment of some known right, benefit, or advantage,* which, except for such waiver, the party otherwise would have enjoyed.'" *Jordan v. Flynt,* 240 Ga. 359, 240 S.E.2d 858, 863 (Ga.1977) (per curiam) (emphasis added) (citation omitted); *see Jones,* 434 S.E.2d at 824 (using the voluntary relinquishment of a known right or benefit definition of waiver in the context of a psychiatrist-patient relationship).

Applying these principles to the facts of this case, we must determine whether Dr. Hicks had a confidential relationship that was breached under Georgia law. Although Baylor required Dr. Hicks to receive treatment for his alcohol addiction, he was permitted to select the facility for this treatment. Dr. Hicks chose Talbott Marsh principally for its purported ability to help physicians suffering from various addictions to return successfully to their medical practices. Cliff Tillery, a licensed psychologist, was Dr. Hicks's primary therapist from the outset of his treatment at Talbott Marsh. Tillery counseled Dr. Hicks in connection with his alcoholism initially and, subsequently, in group therapy with respect to his sexual addiction. Dr. Irons, a psychiatrist with an expertise in sex therapy, was associated specifically to counsel Dr. Hicks regarding his sexual addiction. Dr. Irons and Tillery determined that Dr. Hicks needed specialized treatment at another facility for his sexual addiction, which resulted in his transfer to Charter prior to his final discharge from Talbott Marsh. Dr. Hicks's volitional selection of Talbott Marsh and its therapists together with his actual treatment at that facility are sufficient under Georgia law for the psychiatrist-patient and psychologist-patient privileges to have attached.

Believing that his confidentiality was protected, the public policy basis underlying these privileges and addiction recovery therapy, Dr. Hicks revealed to these therapists, albeit more specifically to Dr. Irons, the details of his sexual addiction, including sex with patients. The record shows that Dr. Hicks trusted the assurances of both of these therapists and believed that the sexual disclosures that they elicited from him

---

regulations is prohibited under State law, neither these regulations nor the authorizing statutes may be construed to authorize any violation of that State law. However, *no state law may either authorize or compel any disclosure prohibited by these regulations.*

42 C.F.R. § 2.20 (emphasis added).

20

would not be revealed to the Texas Board.[28]  Moreover, his revelation of sex with patients occurred *after* Dr. Hicks signed the Texas Board release of his Talbott Marsh treatment records, which he specifically limited to his medical records from October 11, 1993, to January 3, 1994.[29]

It is important to recognize that Dr. Hicks was sent by Baylor and admitted to Talbott Marsh for the treatment of his alcohol addiction.  This was the focus of the Texas Board, which licensed him to practice medicine in Texas, until all of his Talbott Marsh treatment records, including his treatment for sexual addiction, were sent to the Texas Board.[30]  Receipt and review of Dr. Hicks's entire Talbott Marsh treatment

---

[28]In an affidavit accompanying his complaint, Dr. Hicks explained the purported atmosphere of trust in which his therapists encouraged him to participate in his treatment:

> During the therapy sessions, the physicians and staff of Anchor and Talbott Marsh constantly and continually induced and persuaded me to "take the risks of emotional honesty" and to disclose "in a safe place" very damaging and personal information regarding my past.  The representatives assured me, both individually and as part of therapy sessions, that the disclosures were part of a "code of trust" and would not be redisclosed to anyone and particularly not to a state medical board.
>
> ....
>
> Based upon these numerous and repeated assurances of the physicians and staff of Anchor and Talbott Marsh, and based upon the standards of confidentiality I knew to exist between a patient and physician, I did open up and reveal some very personal information, including information with regard to sexual issues.  Upon divulging this information, I was again reassured that none of the information would be released to anyone and that it would remain confidential.

R1-1-Exhibit A at 3-4, WW C, G (affidavit of Raymond D. Hicks, M.D.).

[29]Dr. Hicks's sexual propensities in his Talbott Marsh admission history and treatment records prior to January 3, 1994, stated generally that he had engaged in numerous affairs and sex with prostitutes.  His two Anchor discharge summaries during that period, the first for a cardiac assessment and the second for transfer to Talbott Marsh, show diagnoses of alcohol and nicotine addictions as well as depression.  It was not until *after* January 3, 1994, when his sessions with Dr. Irons began, that Dr. Hicks revealed his sex with patients, the primary concern of the Texas Board upon receipt of his Talbott Marsh treatment records, exhibited by its order governing Dr. Hicks's medical practice after completing the Talbott Marsh recovery program, as opposed to relationships in his personal life.

[30]The December 15, 1993, letter requesting Dr. Hicks's Talbott Marsh treatment records from Sharon Pease, who was investigating his case for the Texas Board, not only commended him for entering treatment for his *alcoholism* but also asked specific questions relating to his *alcohol* use.

21

records caused the Texas Board to become aware of Dr. Hicks's sexual addiction, specifically, his sex with patients. This revelation resulted in the Texas Board's order that narrowly circumscribed Dr. Hicks's medical practice and, ultimately, foreclosed his ability to practice medicine proximate to his home. Given the psychiatrist-patient and psychologist-patient privileges that are operative in this case, we must decide whether the Talbott Marsh January 3, 1994, medical records release signed by Dr. Hicks was lawfully valid authority to send all of his treatment records, including his psychosexual therapy, to the Texas Board.

Dr. Hicks sought the advice of Dr. Lubin, the Talbott Marsh staff member who specialized in counseling physician patients in addiction recovery, as to how to respond to the letters from the Texas Board requesting his treatment records. On the Texas Board release, Dr. Hicks handwrote that he authorized only his Talbott Marsh treatment records from October 11, 1993, the date of his admission there, until January 3, 1994, the date that he signed the release, to be sent. Those records do not disclose Dr. Hicks's sexual encounters with patients because his psychosexual therapy, which elicited that fact, had not commenced at that time.

Dr. Lubin explained to Dr. Hicks that the Talbott Marsh records coordinator would need a Talbott Marsh release to send his treatment records to the Texas Board. The internal, Talbott Marsh release that Dr. Hicks signed was completed by Dr. Lubin and his assistant. Dr. Lubin's vertical slashes marking all categories of treatment records, including psychiatric/psychological records, on the Talbott Marsh release, and not Dr. Hicks's limited designation, was the direction relied upon by Carolyn Perkins, the Talbott Marsh records coordinator, when she sent Dr. Hicks's entire Talbott Marsh treatment records to the Texas Board on April 1, 1994.

Dr. Lubin purportedly was specially knowledgeable regarding state medical licensing boards and, ironically, he had not allowed Talbott Marsh to disclose his own sexual addiction treatment records to his state medical board when he was a patient there. Nevertheless, there is no evidence in the record that Dr. Lubin ever reviewed Dr. Hicks's medical records to see if they contained sensitive sexual disclosures related

22

in therapy and counseling sessions before he made the vertical slashes on the Talbott Marsh release indicating that all of Dr. Hicks's Talbott Marsh treatment records were to be sent to the Texas Board. Furthermore, as Director of Continuing Care at Talbott Marsh, he maintained contact with Dr. Hicks in his psychosexual therapy at Talbott Marsh, Charter, and thereafter. Dr. Lubin well knew that the Talbott Marsh release was valid for one year from the date that a patient signed it and that a patient could revoke his release of treatment records at any time. Yet, there is no evidence that Dr. Lubin informed Dr. Hicks of the sensitivity of the disclosure of sexual addiction to a state medical licensing board at the time that Dr. Hicks signed the blank release form for his treatment records or thereafter, when his therapy with Dr. Irons commenced later in January, 1994, or he was transferred from Talbott Marsh to Charter for further treatment of his sexual addiction prior to his final discharge from Talbott Marsh. At any of these junctures, Dr. Hicks could have revoked the January 3, 1994, release and signed another, more specific Talbott Marsh treatment records release.

Significantly, Dr. Hicks had a confidential or fiduciary relationship with Tillery and Dr. Irons regarding his psychosexual therapy that was breached by Talbott Marsh and, specifically, by Dr. Lubin. He disclosed his sexual encounters with patients in the protected and privileged context under Georgia law of psychiatric/psychological counseling and therapy. He had assurances from these therapists that his consensual sex-with-patients revelation would not be sent to the Texas Board prior to divulging this information in the therapy context for the purpose of overcoming his sexual addiction generally.

Realizing that he needed help in dealing with his sexual compulsion and desiring this treatment while he was at Talbott Marsh for his alcohol addiction, Dr. Hicks specifically sought Dr. Lubin's counsel as to how he should respond to the Texas Board's request for his treatment records prior to his commencing his psychosexual therapy. Because of his severe alcohol addiction, Dr. Hicks was diagnosed as having some cognitive impairment in his intellectual functioning. In addition to undergoing chemical detoxification for his alcohol addiction and medicinal treatment for his depression, Dr. Hicks was susceptible to direction

because he was disturbed about the threat to his medical license, which was necessary for his livelihood. He testified that he believed that the Talbott Marsh release would cover the same time period that he had designated on the Texas Board release. Dr. Hicks, the vulnerable recovering alcoholic, Talbott Marsh patient, relied on his therapists' assurances and on Dr. Lubin's expertise and followed his advice with respect to the Talbott Marsh release, which ultimately terminated Dr. Hicks's medical practice instead of restoring it.

Dr. Lubin's innocuous response letters to the Texas Board, the second one of which was dictated in Dr. Hick's presence, further lulled him into believing that Dr. Lubin, the Talbott Marsh expert in communications between physician patients and their state medical licensing boards, was protecting him while he was at Talbott Marsh and that his recovery therapy or his medical license would not be jeopardized by following Dr. Lubin's advice. The Talbott Marsh release plainly allowed for selection of categories of treatment records to be sent pursuant to a request for records. Yet, Dr. Lubin designated that all of Dr. Hicks's Talbott Marsh treatment records were to be sent to the Texas Board without explaining to Dr. Hicks that he could specify particular treatment records and allowing him to make that election.

Although Dr. Hicks's Talbott Marsh therapists determined that he was sufficiently recovered to return to his medical practice as many physician patients preceding him, like Dr. Lubin, had done without full disclosure of all of their Talbott Marsh treatment records, Dr. Hicks ultimately was denied that opportunity. The disclosure of his sex with patients, which surfaced in his privileged psychiatric/psychological therapy with Dr. Irons and Tillery, prevented his returning to his previous medical practice. In effect, Talbott Marsh, through Dr. Lubin's failure to obtain an informed consent from Dr. Hicks for release of all of his Talbott Marsh treatment records, undermined the purpose of his recovery therapy, to which he had devoted a year of his life in sincere, cooperative work.

The jury concluded that Dr. Lubin and Talbott Marsh had breached a fiduciary duty that they owed to Dr. Hicks and that merely his signature on the Talbott Marsh release form, subsequently completed by Dr. Lubin and his assistant, was not a knowing waiver of his rights regarding the release of his Talbott Marsh

24

treatment records to the Texas Board. Therefore, the release of his Talbott Marsh treatment records, based on a form that he did not complete and about which he was not fully informed as to its consequences, was unauthorized. Drawing all reasonable inferences in favor of Dr. Hicks, we find ample evidence in this record to support the jury's verdict, which shows careful consideration of the value of Dr. Hicks's loss of his livelihood as reflected in the award, an amount considerably less than the damages requested in his complaint.[31]

B.      *Motion for New Trial*

Appellants alternatively argue that the district judge improperly denied their motion for new trial because the judge incorrectly excluded evidence relevant to causation and damages and, consequently, did not instruct the jury on proximate cause. This argument relates to Charter's release of Dr. Hicks's treatment records containing substantially the same information regarding his sexual addiction, including sex with patients, to the Texas Board pursuant to a subpoena.[32] To have granted appellants' motion for a new trial, the district judge would have had to have determined "the verdict contrary to the great weight of the evidence; we will reverse the denial of a motion for a new trial only for an abuse of discretion." *Richards v. Michelin*

---

[31]Appellants also contend on appeal that they are immune under O.C.G.A. § 24-9-44. This statute, however, is inapplicable not only because we conclude that the evidence supports the jury's verdict that there was no valid release of treatment records executed by Dr. Hicks but also because the statute deals with "limited consent to disclosure," a term defined in § 24-9-41(5) to mean "proper authorization ... given for a specific purpose related to such person's health or related to such person's application for insurance or like benefits." O.C.G.A. § 24-9-41(5). Dr. Hicks was neither applying for insurance nor deriving any healthcare benefits from the Texas Board. On the facts of this case, the Georgia immunity statute is unavailing to appellants.

[32]The subpoena obtained by the Texas Board for Dr. Hicks's Charter treatment records did not comply with 42 C.F.R. § 2.64, designed to protect patients when disclosure of treatment records is sought for noncriminal purposes. These stringent federal regulations include application for disclosure using a fictitious name, adequate notice to the patient, a closed judicial hearing, a judicial determination that good cause exists to order disclosure because no other feasible method is available for obtaining the information and the need for disclosure outweighs injury to the patient and the physician-patient relationship, and an order delineating the parts of the patient's records to be disclosed as well as limiting the persons to whom disclosure is made. *See id.* The district judge recognized: "It is clear that Charter Hospital was negligent in complying with a subpoena that was deficient in numerous respects, including the fact that it was unaccompanied by the required authorizing court order, and the fact that plaintiff was never afforded advance notice of the subpoena or an opportunity to be heard on the matter." R4-53-2 n.1.

*Tire Corp.,* 21 F.3d 1048, 1052 (11th Cir.1994). "Motions for new trial on the basis of erroneous and prejudicial jury instructions are committed to the discretion of the trial court and reviewed to ascertain whether there has been a clear abuse of that discretion." *Christopher v. Cutter Laboratories,* 53 F.3d 1184, 1190 (11th Cir.1995).

Prior to trial, Dr. Hicks filed a motion in limine seeking the exclusion from the trial of any reference to the fact that his treatment records from Charter were sent to the Texas Board. The district judge granted the motion because Talbott Marsh's sending Dr. Hicks's entire treatment records to the Texas Board was not remote in time from his alleged injuries. The judge also determined that, because the alleged harm was the foreseeable result of Talbott Marsh's conduct, no proximate cause issue was raised. The judge reasoned that, when there are two separate causes-in-fact of a single injury, either of which alone would have sufficed to cause the alleged harm, it is inherently unfair to permit "both guilty parties to avoid liability by pointing to each other." R4-53-2. The judge concluded that, since Talbott Marsh could not escape liability by claiming that Charter's conduct was an "intervening cause" of Dr. Hicks's injuries, "the fact that Charter released plaintiff's records is irrelevant to this action." *Id.* He also noted that admission of evidence about the subsequent release of Charter records would confuse the issues and unfairly prejudice Dr. Hicks's case. Consequently, the jury was not charged on proximate or intervening cause.

"[W]hether proximate cause exists in a given case is a mixed question of law and fact." *Atlanta Obstetrics & Gynecology Group, P.A.,* 260 Ga. 569, 398 S.E.2d 16, 17 (Ga.1990). "Although what amounts to proximate cause is undeniably a jury question, it will be determined by the court as a matter of law in plain and undisputed cases." *McAuley v. Wills,* 251 Ga. 3, 303 S.E.2d 258, 260-61 (Ga.1983); *see Harrison v. Jenkins,* 235 Ga.App. 665, 510 S.E.2d 345, 346 (Ga.Ct.App.1998) (en banc) (recognizing that "there is a limit" to the jury's determining proximate cause for an injury sustained, which is in a case where the facts are obvious and uncontroverted, and the judge decides it). "The decision may be made by the trial judge or appellate court only if reasonable persons could not differ as to both the relevant facts and the evaluative

26

application of legal standards (such as the legal concept of 'foreseeability') to the facts." *Atlanta Obstetrics & Gynecology Group,* 398 S.E.2d at 17; *see Western Stone & Metal Corp. v. Jones,* 180 Ga.App. 79, 348 S.E.2d 478, 480 (Ga.Ct.App.1986) (en banc) ("[W]here the jury can draw but one reasonable conclusion, the issue is plain, palpable, and undisputed and should be ruled upon as a matter of law.").

> "While the general rule is that if, subsequently to an original wrongful or negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act."

*Harrison,* 510 S.E.2d at 346 (citation omitted).

Dr. Hicks's Talbott Marsh treatment records were sent to the Texas Board on April 1, 1994, approximately eleven weeks *before* the Charter records were sent pursuant to a subpoena obtained by the Texas Board. The Texas Board's order quotes liberally from Dr. Hicks's Talbott Marsh treatment records. The direct connection between the unauthorized release of Dr. Hicks's confidential, Talbott Marsh treatment records and the Texas Board order is obvious. Talbott Marsh cannot escape liability for breaching the duty of confidentiality that it owed to Dr. Hicks regarding his treatment records by shifting blame to a later tortfeasor, Charter.

Furthermore, the evidence does not support the introduction of an intervening cause, when it was Talbott Marsh that effectively terminated Dr. Hicks's medical career by its unauthorized release of his treatment records disclosing his psychosexual therapy. Indeed, the Texas Board would not have requested Dr. Hicks's Charter treatment records if Talbott Marsh had not sent to the Texas Board his psychosexual therapy, revealing his sexual encounters with patients and showing his transfer to Charter for more specialized sexual addition treatment. Significantly, Talbott Marsh's breach of its fiduciary duty of confidentiality to Dr. Hicks not only led to the Texas Board's foreseeable request for Dr. Hicks's Charter treatment records, but also

27

those records were substantively identical to his sexual revelations in his Talbott Marsh psychiatric/psychological treatment records for his sexual addiction.[33]

As the district judge explained: "[B]ecause defendants admit that Charter released the 'same information' to the state board that defendants released, it is clear that all of the harm sustained by plaintiff would have resulted from defendants' conduct alone, regardless of Charter's later acts." R5-78-4. The injection of the Charter release of Dr. Hicks's medical records into the case would only have served to mislead and confuse the jury. Appellants had a legal duty to protect the confidentiality of Dr. Hicks's Talbott Marsh treatment records. *See* O.C.G.A. § 37-7-166(a)(1). As the district judge concluded: "The fortuity of Charter Hospital's subsequent incompetence is simply irrelevant" to the liability of Talbott Marsh and Dr. Lubin. R5-78-3. The judge did not abuse his discretion by not instructing the jury on proximate or intervening cause in accordance with his ruling on the motion in limine.

*III. CONCLUSION*

In this appeal, appellants challenge the jury award to Dr. Hicks for breach of the duty of confidentiality regarding his psychosexual treatment records. As we have explained, the jury's verdict based on unauthorized release is supported by the evidence, and the motions for judgment as a matter of law and for a new trial properly were denied. Accordingly, the jury verdict is AFFIRMED.

BRIGHT, Senior Circuit Judge, concurs in the result.

CA(99)5651-1,SIZE-1 PAGE,TYPE-PI

CA(99)5651-2,SIZE-1 PAGE,TYPE-PI

CA(99)5651-3,SIZE-1 PAGE,TYPE-PI

CA(99)5651-4,SIZE-1 PAGE,TYPE-PI

---

[33]There is no evidence in the record that Dr. Hicks made any new or different disclosures regarding his sexual addiction or sex with patients in his Charter psychosexual therapy than he did in his Talbott Marsh psychosexual therapy, and the parties do not represent otherwise.

28