A. GRIFFIN, Plaintiff-Appellee,

v.

CITY OF OPA-LOCKA, Earnie P. Neal, Defendants-Appellants.

No. 00-12200.

United States Court of Appeals,

Eleventh Circuit.

Aug. 17, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 98-0155-CV-PAS), Patricia A. Seitz, Judge.

Before ANDERSON, Chief Judge, and FAY and BRIGHT[*], Circuit Judges.

FAY, Circuit Judge:

## I. Introduction

This is an appeal from a $2 million jury verdict and award in favor of Plaintiff A. Griffin ("Griffin") against the City of Opa-Locka ("the City") and its former City Manager, Earnie Neal ("Neal"), stemming from Neal's sexual harassment and assault against Griffin. Both the City and Neal appeal. Neal argues that the district court erred in denying his motion to bifurcate the trial against him and the City; that the district court committed reversible error in permitting expert testimony to bolster Griffin's allegations that she was raped; and that the district court abused its discretion in denying Neal's motion for a new trial due to emotional outbursts by Griffin and another witness in the presence of the jury. The City argues that the district court erred in denying the City's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, and its Motion for Remittitur.

We review the district court's rulings on the admissibility of evidence, mistrial, bifurcation, and requests for new trial for abuse of discretion. *Alexander v. Fulton County, Georgia,* 207 F.3d 1303, 1324-25 (11th Cir.2000); *Hicks v. Talbott Recovery System, Inc.,* 196 F.3d 1226, 1242 (11th Cir.1999); *Messer v. Kemp,* 760 F.2d 1080, 1087 (11th Cir.1985), *cert. denied,* 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986). A trial court's denial of a motion to remit is reviewed for clear abuse of discretion. *Farley v. Nationwide Mutual Ins. Co.,* 197 F.3d 1322, 1335 (11th Cir.1999). We review the district court's denial of the motion for judgment as a matter of law *de novo,* considering the evidence in the light most favorable to

[*]Honorable Myron H. Bright, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Griffin. If a reasonable jury could have found in favor of Griffin, we will affirm the trial court's decision. *Hicks*, 196 F.3d at 1236. For the reasons set forth more fully below, we affirm the district court's final judgment in favor of Griffin as against Defendant Neal on all claims. We reverse the district court's judgment against the City only as to the City's liability for the sexual assault against Griffin under § 1983. We affirm in all other respects.

## II. Factual and Procedural History

Griffin is a 32-year old single mother who, prior to the birth of her son, attempted to pursue a musical career. In 1992, she commenced employment with the City as a temporary employee and eventually became a permanent billing clerk in the City's water department in 1993. The City, located in northwest Miami-Dade County is a small municipality with fewer than 200 employees. In June 1995, the City hired Earnie Neal as City Manager. As City Manager, Neal was the Chief Executive Officer for the City, in charge of its day-to-day operations and personnel decisions.

Almost immediately after Neal started his job with the City, he began harassing Griffin. He summoned her to work with him on the first day by demanding that the "big tit" or "big breasted" girl be sent to his office.[1] Immediately, he began asking her a series of personal questions regarding where she lived, who she lived with, who cared for her child, whether she was married, whether she had a boyfriend, and where was her child's father. The next day, Neal telephoned Griffin and asked her to guess what the "P" in his name stood for. Griffin testified that Neal was referring to his penis and that he would not get off of the phone until she guessed. Neal told her that he was looking for a girlfriend and wondered whether she could help him with that. He also told her that he did not like where she was sitting and wanted her to sit in front of him so that he could see her.

According to Griffin, despite her rejecting all of his advances, Neal continually demanded hugs and questioned her whether she had a man, reiterating that he was still looking for a girlfriend. He also told her that she needed a "man [like Neal] with money." Griffin stated that on one occasion, Neal asked her in front of the Vice Mayor whether she was going to a specific function that night. When she replied that she was, Neal stated, "Good, so we can dance close together," at which point Neal and the Vice Mayor started

---

[1]Several employees testified that they were aware that Neal had requested that the "big tit girl" work for him and that it was commonly known that Neal was sexually interested in Griffin. As an official explanation for moving Griffin to Neal's office, Griffin was given a memo indicating that she was to be "cross-trained." The City's director of human resources could not identify any other such memo ever having been written by the City.

laughing, and Neal sent Griffin back to her desk. Neal also repeatedly asked her to go out with him. Griffin recalled an occasion when Neal commented that he and Winston Mottley, one of her supervisors, were going to come over and wanted her to cook dinner for them. Both Motley and Neal laughed at this comment.

On multiple occasions, Neal called Griffin into his office and told her he would have to replace her if she did not cook for him, tell him how good he looked, and take care of him. In addition, he commented on how she should wear her hair and that she was gaining too much weight. Griffin started dieting for fear she would lose her job. Neal also began regularly hugging her tightly to feel her breasts and look down her shirt. In addition to the daily hugs, Griffin testified that while she was sitting with a couple of officials at a City function, Neal sat behind her and rubbed his knee against her buttocks and whispered in her ear that "I'm still looking for a girlfriend." At another function, Neal put his hand on her hip and told her that she had hurt his feelings again because she would not sing at an event congratulating him for being City Manager.

Griffin also recalled Neal calling her at home on a day that the City offices were officially closed. He asked her whether she was sleeping next to her boyfriend and summoned her to the office for no apparent reason. Although Griffin was eventually supposed to go back and work for the water department, Neal would summon her everyday to his office even though he gave her no work. When she asked Neal to return to her old job, he told her that he was hurt and that he could not believe she wanted to leave him. Griffin testified that she asked various other City officials to help her get her old job back because she was unhappy working for the City Manager. Several employees testified that she looked miserable during the time she worked in Neal's office in stark contrast to the cheerful and friendly demeanor she had before she started working for Neal.

In October 1995, after City employees were given a cost of living increase, Neal told Griffin that he personally had seen to it that she got a larger increase than other employees. He said, "You got a bigger raise than anybody, now will you go to dinner with me?" Griffin testified that she felt like he was trying to buy her to make her go out with him and that she had no choice but to start looking for another job. Shortly thereafter, Griffin tendered her resignation to be effective two weeks later because she could no longer tolerate Neal's sexual advances or her working environment. Griffin testified that Neal was shocked by her resignation and tried to talk her out of it. He also told her he would have to figure a way to take her out before she left. Griffin testified that she did not report Neal's conduct or complain to anyone because he was her boss, she did not have the courage to do so, and she did not want to create conflict.

After she tendered her resignation but before her job with the City ended, Griffin attended a Rotary

Club function where she was scheduled to sing. The Rotary Club was very important in the workplace culture of the City and was attended by the Mayor, Commissioners, Neal, and several City department heads. Although Griffin arranged for a ride home with the City's police chief following the event, Neal told her and the police chief that he would take her home instead. Upon arriving at her apartment, Neal grabbed Griffin's music equipment and began carrying it upstairs, despite her telling him that she could take care of it herself. He followed her into her apartment uninvited and asked her to get him a drink. While she was getting him water or juice, Neal came up behind her in the kitchen and raped her.

Griffin testified that after the rape, she feared for her life and that she felt that calling the police might make it worse since Neal had previously served as a police chief in the nearby town of Florida City, Florida. She did not believe that anyone would take her side, and she tried to go on as if the rape had not occurred. She went to work the next day and every day until the end of her employment a few days later. Several months later, Griffin decided to come forward about the rape. She contacted an attorney and this lawsuit ensued.

Griffin sought damages against the City for sexual harassment and sexual assault under Title VII (Count I); the Florida Civil Rights Act (Count II); 42 U.S.C. § 1983 (Counts III and IX); and state tort law (Count VIII). She also alleged assault and battery claims against Neal (Count IV); violations of the Violence Against Women Act, 42 U.S.C. § 13981 (Count V); Intentional Infliction of Emotional Distress (Count VI); and Invasion of Privacy (Count VII). After a two-week trial, the jury concluded by special interrogatory that Neal sexually harassed Griffin, that the harassment was a custom or policy of the City, and that Neal raped her under color of law. The jury also concluded that the City was deliberately indifferent in hiring Neal and found against Neal on the tort claims. The jury awarded Griffin $500,000 for the harassment and $1.5 million for the rape.

### III. Discussion

### A. Neal's Appeal

### 1. Bifurcation

Because we can dispose of Neal's arguments in fairly short order, we address his appeal first. He raises three arguments. First, he argues that the district court's refusal to bifurcate the trial of the claims against him from those against the City resulted in unfair prejudice because Griffin was permitted to introduce evidence that Neal harassed other women and had a reputation as a harasser to prove that the City had a custom or policy of being indifferent to women. Neal contends that although such evidence may have been

admissible as to Griffin's claims against the City, it was inadmissible character evidence as against Neal intended to show that he was a "bad person" who acted in conformity with his prior bad acts.

Rule 42(b) of the Federal Rules of Civil Procedure affords a district court discretion to order separate trials where such order would further convenience, avoid prejudice, or promote efficiency. In this case, we cannot say that the district court abused its discretion in concluding that bifurcation would "not significantly increase judicial efficiency" or in its conclusion that bifurcation would "result in the Court essentially trying the same case twice." *See* Omnibus Order, March 8, 2000. There is clearly substantial overlap in the issues, facts, evidence, and witnesses required for Griffin's claims against both Neal and the City.

Moreover, although Neal argues at length that his rights were prejudiced by the introduction of his prior bad acts, he neither objected to the introduction of such evidence at trial; nor did he ask the district court for a limiting instruction. We do not believe that the district court committed plain error in failing to provide a limiting instruction *sua sponte*.[2] *United States v. Cross,* 928 F.2d 1030, 1051, n. 69 (11th Cir.1991)(reviewing for plain error district court's failure to *sua sponte* caution jury that testimony could not be considered as evidence of defendant's bad character or disposition to commit the crime); *United States v. Waldrip,* 981 F.2d 799 (5th Cir.1993)(court's failure to *sua sponte* provide a limiting instruction is plain error only when the court's charge as a whole is so erroneous as to result in a likelihood of a grave miscarriage of justice); *United States v. Tracy,* 12 F.3d 1186, 1195 (2d Cir.1993)(when defendant fails to request instruction, trial court's failure to instruct is a ground for reversal only when it constitutes an error that is "egregious and obvious" and reversal is "necessary to redress a miscarriage of justice"); Fed.R.Evid. 105 (when evidence is admissible for one purpose but not another, "the court, *upon request,* shall restrict the evidence to its proper scope and instruct the jury accordingly").

In light of our determination that the district court's failure to *sua sponte* provide a limiting instruction was not plain error, we need not decide whether the evidence of Neal's prior bad acts would have actually been admissible in Griffin's case against Neal. Although Fed.R.Evid. 404(b) prohibits the introduction of prior bad acts to prove a defendant's bad character or that he acted in conformity therewith, the Rule does not preclude the introduction of such evidence to demonstrate a defendant's plan, motive, opportunity, intent,

---

[2]It does appear that the district court offered some limiting instruction either *sua sponte* or at the request of the City regarding testimony about prior acts of harassment by Neal. The court instructed the jury in the final charge that evidence of other acts of harassment could not be considered in determining whether Neal harassed Griffin.

pattern, etc. Evidence of Neal's harassment of other women who worked under him is arguably admissible for one or more of these acceptable purposes.

## 2. Expert Testimony

Next, Neal argues that the district court erred in allowing an expert witness to testify that Griffin's post-assault behavior conformed to that of other assault victims. Griffin offered the testimony of Professor Louise Fitzgerald, an expert in sexual harassment, assault, and rape. Fitzgerald testified about common responses by victims of rape or harassment, such as the failure to resist a perpetrator, bathing immediately after the assault, and the failure to file or a delay in filing a formal report or charge. After reviewing the testimony, we do not believe that Fitzgerald commented on Griffin's credibility, veracity, capacity for truthful testimony, or whether the events described by Griffin, in fact, transpired. Accordingly, we do not believe that the district court abused its discretion in permitting the testimony.

## 3. Emotional Outbursts

Finally, Neal argues that the district court abused its discretion in not granting him a new trial because the jury was tainted by emotional outbursts from Griffin and another witness. The first incident occurred before voir dire of the jury when Griffin became very emotional and upset and left the court room crying out loud. She walked through the lobby where the jury panel was waiting and then into the bathroom. Many prospective jurors witnessed the incident. Although Neal argues on appeal that the district court erred in not granting him a new trial based on Griffin's emotional outburst, it appears that Neal neither requested a mistrial at the time of the incident; nor did he move to strike the jury panel. In any event, we find no abuse of discretion in the district court's decision not to strike the panel.[3] The court questioned each of the prospective jurors about what they had witnessed and what effect it might have on their partiality. Each juror ultimately selected to serve on the jury stated that he or she could ignore the incident and decide the case based on the evidence.

The second incident upon which Neal bases his appeal occurred during the testimony of Joanne Jeffery, a Florida City employee, who testified that Neal had harassed her on daily basis while he was an employee of Florida City. Jeffery's testimony was almost immediately interrupted when she broke down crying on the witness stand. The court promptly ordered a recess, and both Neal and the City moved for a mistrial. Although the court initially expressed serious concern about the emotional nature of the testimony,

---

[3]The City did request that the district court strike the panel, and the district court refused.

it ultimately declined to grant a mistrial. The court then instructed the jury to disregard the witness' crying, and each of the jurors indicated that they were able to do so. One week later, the court struck Jeffery's testimony "in toto" and instructed the jury that it was to completely disregard it.

Although Neal contends that Jeffery's emotional outburst on the witness stand was so severe and disruptive that he was denied his right to a fair and impartial jury, we have held that because the trial judge is in the best position to assess the prejudicial effect of an emotional outburst, the decision whether to grant a mistrial lies within his sound discretion. *Messer,* 760 F.2d at 1087(affirming trial judge's refusal to grant mistrial after murder victim's father began screaming at and lunged toward the defendant during defendant's testimony). The district court gave curative instructions and ultimately struck the testimony of the witness. *Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir.1985)(stating that we presume that juries follow the court's instructions). As such, we find no abuse of discretion.

### B. The City's Appeal

In its judgment against the City, the jury found that Neal sexually harassed Griffin, that the harassment was a custom or policy of the City, that Neal raped her under color of law, and that the City was deliberately indifferent in hiring Neal. The City claims several errors on appeal. First, the City argues that the judgment in favor of Griffin must be reversed because as a matter of law: the City cannot be liable for any sexual assault committed by Neal; the City cannot be liable for sexual harassment; and the City was not deliberately indifferent in hiring Neal. Second, the City argues that it is entitled to a new trial because the district court abused its discretion in allowing testimony by certain witnesses and permitting evidence of prior bad acts for the purpose of showing bad character or propensity. Finally, in the alternative, the City argues that it is entitled to a remittitur in the amount of damages or a new trial on damages. We address each argument in turn.

### 1. City's Argument it is Entitled to Judgment as Matter of Law

### a. Liability for Sexual Assault

### i. Color of State Law

In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law. *Almand v. DeKalb County, Georgia,* 103 F.3d 1510, 1513 (11th Cir.), *cert. denied,* 522 U.S. 966, 118 S.Ct. 411, 139 L.Ed.2d 314 (1997). A person acts under color of state law when he acts with authority possessed by virtue of his employment with

the state. *Id.* "The dispositive issue is whether the official was acting pursuant to the power he/ she possessed by state authority or acting only as a private individual." *Edwards v. Wallace Community College,* 49 F.3d 1517, 1523 (11th Cir.1995). It is firmly established that a defendant in a § 1983 suit acts under color of law when he abuses the position given to him by the State. *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941).

The City maintains that as a matter of law, it cannot be liable for any sexual assault committed by Neal against Griffin because Neal was not acting under color of state law at the time of the assault. This Court has previously recognized that under certain circumstances, a rape of a person by a state actor or official could violate the Constitution and serve as the basis for a suit under § 1983. *Almand,* 103 F.3d at 1513 (*citing Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989)(involving rape by uniformed deputy of woman in his custody); *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476, 479-80 (9th Cir.1991) (upholding jury determination that defendant acted under color of law when he raped women looking for employment while meeting with them under pretext of providing services pursuant to his job)). Whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing. *Almand,* 103 F.3d at 1515. It is only through a process of "sifting facts and weighing circumstances" that we arrive at a correct determination. *McDade v. West,* 223 F.3d 1135, 1139 (9th Cir.2000).

Based on the totality of facts and circumstances of this case and construing all of the evidence in a light most favorable to Griffin, we believe that there is evidence from which a reasonable jury could conclude that Neal's actions in harassing and ultimately raping Griffin occurred while he was acting under color of law. The rape occurred following a Rotary Club meeting attended by Neal, Griffin, the Mayor, City Commissioners, and the City Department heads. That the Rotary Club meeting was not technically an official City function does not trouble us insofar as the color of law analysis goes. There was testimony by Griffin and others that City employees were expected to attend Rotary Club meetings. In fact, Neal testified that after he failed to attend one Rotary Club meeting, the Mayor made him "sternly aware" of the Club's significance, and he never again missed a meeting. Moreover, there was testimony that Griffin was at the event as a City employee. Neal himself testified that he attended the function as City Manager, that he was there "preserving his job" and "taking care of business," and that he stayed close to the Mayor or Commissioners in case they needed anything. Neal specifically asked Griffin and other City employees to attend the meetings, the Mayor

of the City was the founder of the Rotary Club chapter, and the City paid for employees, including Griffin, to join. In short, participation in the Rotary Club was a command performance for City employees.

After learning that Griffin had arranged for the City's police chief to take her home following the Rotary event due to car troubles, the evidence supports the conclusion that Neal intervened[4] and invoked his authority as City Manager to create the opportunity to be alone with Griffin, to take her home, and then to rape her. In front of various City officials, including the Mayor, several Commissioners, and the Assistant City Manager, Neal told Griffin that he would take her home and that she should advise the police chief that he, the City Manager, would take her.[5] In addition, Neal himself also instructed the police chief that he would take her home and that the situation was all taken care of.[6]

On the way to Griffin's home, Neal used his authority to permit Griffin to park her car inside the City's police department and told her that he would have the City fix it. During the ride from the police station to her apartment, Neal and Griffin discussed her work for the City, and Neal tried to dissuade her from leaving her job. Upon their arrival at her apartment and after insisting on helping her with her equipment, Neal came up behind Griffin while she was in the kitchen and said, "Angie, you know that I have been waiting a long time for this." When she refused his sexual advances, Neal, as he had done numerous times throughout the course of his harassment of her, reminded her of his authority by saying "I can't believe you are telling me no after everything that I have done for you." Neal then proceeded to rape her.

It appears that Neal continued to invoke his authority over Griffin to harass her and humiliate her even after the sexual assault. When Griffin reported to work the day after Neal assaulted her, Neal summoned her to his office, where he asked her for a hug and told other workers about the great time he had the previous night and that "I want to do it again like I did last night, I want to do it all over again." Neal also used his authority to have the City repair Griffin's car. After the rape, he instructed a City employee to repair the car

---

[4]In Neal's words, he offered his help, "as the manager would."

[5]Griffin testified that she did not protest or refuse because Neal was still her boss and she did not want to make a scene or be negative in front of all of the City officials because she needed to get good references from them.

[6]Neal also told another Rotary Club member who offered Griffin help that he should not be concerned and that everything was "taken care of" and "arrangements had been made." The Rotarian testified that Griffin looked upset.

and told him not to ask any questions or answer any questions about the car repair.[7]

Although we are persuaded that the foregoing facts demonstrate that Neal utilized his authority as City Manager to facilitate the assault on Griffin and that he was therefore acting under color of law at the time of the assault, we do not believe that under the facts of this case that we are required to view the sexual assault in isolation or ignore Neal's persistent abuse of authority leading up to the assault in making our color of law determination. Rather, we believe that the entire pattern of abuse and harassment against Griffin that eventually culminated in her rape is relevant to our color of law analysis. In other words, Neal's official interactions with Griffin as her boss during and after work hours, his continual sexual harassment of her during those interactions, and the ultimate sexual assault constitute an indivisible, ongoing series of events. *Doe v. Taylor Independent School District,* 15 F.3d 443, 461 (5th Cir.), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994)(Higginbotham, J., concurring)(teacher's official interactions with student and his sexual activity with her constituted an "indivisible, ongoing relationship" even though a significant amount of the sexual misconduct occurred after hours and off school grounds).

The pattern of Neal's abuse of his authority began the first day of his employment with the City and did not end until after he sexually assaulted Griffin and she left her job at the City for good. From day one, he utilized his authority as City Manager to harass and intimidate her by repeatedly insisting she owed him something for "all of the things" that he did for her, including giving her a pay raise for which she was apparently not entitled, threatening her with her job if she did not do certain things for him like cook, lose weight, and tell him how good he looked, demanding that she work in his office (although he apparently gave her no work), touching her inappropriately, continually requesting hugs, dates, and favors despite her refusal to go out with him, and asking her intimate questions. It is within this context of Neal's continual exploitation of and leverage of his authority over Griffin that we find a sufficient nexus between his duties and obligations as City Manager and Griffin's boss and the abuse of that authority to facilitate his harassment and ultimate sexual assault of her.[8]

---

[7]Upon learning that the car was Griffin's, the water department supervisor allegedly told another City employee that "[Neal] must have gotten to her. We have Angie's car in the back."

[8]That Griffin had already resigned from her position at the City at the time of the assault does not change our conclusion that Neal used and abused his authority to perpetrate against Griffin sexual harassment and assault. Neal was Griffin's boss before, during, and for a time after the sexual assault. *Doe,* 15 F.3d at 462 (Higginbotham, J., concurring)(noting the significance in the color of law analysis that defendant was victim's teacher before, during, and after the sexual misconduct).

Although we are unaware of any cases directly on point, we believe our conclusion that Neal was acting under color of law is supported by several cases where state employees were held to be acting under color of law when they utilized their authority to create the opportunity for or to facilitate a sexual assault. For example, in *Doe v. Taylor,* the Fifth Circuit found that there was a sufficient nexus between a teacher's duties and his sexual relationship with a student for color of law purposes where the sexual misconduct began on school grounds and where the defendant "took full advantage of his position as [plaintiff's] teacher" to create opportunities for sexual contact, exempt her from doing schoolwork, to give her good grades, and to intervene on her behalf to get her a better grade in another class. *Doe,* 15 F.3d at 452, n. 4. Like the teacher in *Doe,* Neal's improper sexual conduct started while he and Griffin were on the job at the workplace, he used his authority to sexually harass her during and after work hours, held her job and job benefits over her head,[9] and he ultimately used his authority as City Manager and her boss to create the opportunity to be alone with her and to rape her.[10]

In addition to *Doe,* several other cases have similarly held that a state employee acts under color or law when he utilizes his authority to create the opportunity to facilitate a rape or sexual assault. *Dang Vang,* 944 F.2d at 479-80 (employee of state employment agency acted under color of law when he raped women looking for employment while meeting with them under pretext of providing employment services or teaching them to drive); *Rogers v. City of Little Rock, Arkansas,* 152 F.3d 790 (8th Cir.1998)(finding that police officer acted under color of law where he followed plaintiff home after a traffic stop, told her she owed him one for letting her off without a ticket, and then he raped her).

In contrast to the aforementioned cases where a state employee used his authority to create the opportunity to assault a victim, the City relies on a series of cases where the performance of a state actor's official duties merely facilitated the meeting of or development of a relationship between the state actor and another person; and the state actor later, on his own time and wholly independent of his official duties, commits an assault or other constitutional tort against that person. Under those circumstances, the law is clear

---

[9]Specifically, he repeatedly threatened that she would lose her job, he required that she work in his office although he gave her no work, and he gave her a raise to which she was not entitled.

[10]Although the color of law analysis is different and considerably more restrictive than the determination whether a supervisor has invoked his authority for purposes of imposing Title VII liability, we cannot help but noting the similarities between the instant case and *Huitt v. Market Street Hotel Corp.,* No. CIV. A. 91-1488-MLB (D.Kan. June 10, 1993)(employer could be liable for hostile environment sexual harassment where a supervisor invoked his authority to make it more difficult for victim to get a ride home, supervisor then drove her home himself, and raped her on the way).

that the state actor is not acting under color of law. *Almand,* 103 F.3d at 1514 (although victim became acquainted with police officer through his official duties in investigating victim's daughter's disappearance, defendant used sheer force, not his authority as a police officer, to bust through her front door and rape her); *Roe v. Humke,* 128 F.3d 1213 (8th Cir.1997)(although police officer met the student through his role as goodwill ambassador to school, no nexus existed between his official duties and molestation of student where the defendant molested the student at his farm, while he was off-duty, in plain clothes, driving his personal car, and did not pretend to be engaged in any official activity); *Becerra v. Asher,* 105 F.3d 1042, 1047 (5th Cir.), *cert. denied,* 522 U.S. 824, 118 S.Ct. 82, 139 L.Ed.2d 40 (1997)(although teacher had "first befriended and shown a special interest in" the victim at school, there was no nexus between official duties as teacher and sexual assault where teacher molested student off campus five months after student withdrew from school); *D.T. v. Independent School District,* 894 F.2d 1176, 1186-88 (10th Cir.1990)(teacher was not acting under color of law when he molested students during summer vacation, while under no contractual obligation to school district, molestation took place at his home following a fund-raising activity for a basketball camp not affiliated with the school; and the events were the product of a private activity that the plaintiffs voluntarily and freely participated in as private individuals); *Mooneyhan v. Hawkins,* 129 F.3d 1264 (6th Cir.1997)(unpublished decision holding that defendant police officer took advantage of an obviously intoxicated plaintiff and his ten-month friendship with her to facilitate the sexual assault).

Although it is clear that in each of these cases, the state actor became acquainted with or developed a relationship with a victim pursuant to his official duties, the assault or constitutional injury caused by each defendant was committed completely away from and outside the ambit of his official duties or obligations. *Roe,* 128 F.3d at 1217-18 (rejecting argument that sexual abuse would not have occurred if teacher had not won student's trust and affection through role as teacher; constitutional violations do not "extend to the development of trust and affection"). In none of these cases was the court faced with the situation confronted by this Court, where the defendant engaged in a pattern of unconstitutional behavior against a particular victim while in the course of his official duties at the workplace, and such unconstitutional activity continued, and in fact, escalated outside the workplace. Neal's official duties did not simply provide him the opportunity to become acquainted with Griffin or to develop a relationship of trust with her that he later used to facilitate

assault outside the workplace.[11]  Rather, he used his authority as Griffin's boss on a daily basis to harass and humiliate her during and after work hours both at the workplace and City-related functions.  This pattern of harassment and the assertion of control over Griffin both at the workplace and beyond is what differentiates this case from those where a police officer or teacher befriends or meets a victim while acting in the course of his official duties, but then later assaults them off-duty, off premises while acting in a private or personal capacity.[12]

## ii. Policy or Custom

The City next argues that even if Neal's assault upon Griffin was taken under color of state law, it cannot be liable because Neal's actions were not taken pursuant to a municipal custom or policy.  The law is clear that a municipality cannot be held liable for the actions of its employees under § 1983 based on a theory of respondeat superior.  *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 663, 98 S.Ct. 2018, 2022, 56 L.Ed.2d 611 (1978).  Rather, only deprivations undertaken pursuant to governmental "custom" or "policy" may lead to the imposition of governmental liability.  *Floyd v. Waiters,* 133 F.3d 786, 793 (11th Cir.1998).

Clearly, the City did not have a formal policy condoning or endorsing sexual harassment or sexual assault by City employees.  Nevertheless, § 1983 liability may be imposed on a municipality based on "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 795.  This Court set out the standard for imposing such liability in *Brown,* stating that:

> [t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Brown,* 923 F.2d at 1481 (citations omitted).  In addition, we have also held that a municipality's failure to

_____

[11]To the contrary, Neal and Griffin's personal relationship did not extend beyond that of supervisor to supervised and harasser to harassed.

[12]Our holding today that Neal was acting under color of law when he raped Griffin comports with the well established rule of law that not every tort committed by a state actor rises to the level of a constitutional violation.  It is the egregious and escalating nature of the abuse of Neal's official authority in this case to perpetrate both harassment and ultimately rape against Griffin that tips the color of law analysis in favor of concluding he was acting under color of law.  Although subtle, we again reiterate the critical distinction in the color of law analysis between those cases where a state actor directly uses his official authority to create the opportunity to sexually assault a victim and those cases where a state actor merely uses his authority to develop or facilitate a relationship of trust with a victim, even though that relationship in some attenuated sense serves as a but for cause of a later sexual assault.

correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy "if the municipality tacitly authorizes these actions or displays deliberate indifference" towards the misconduct. *Brooks v. Scheib,* 813 F.2d 1191, 1193 (11th Cir.1987).

After reviewing the record in full and taking all inferences in favor of Griffin, the evidence establishes without any question that sexual harassment was the on-going, accepted practice at the City and that the City Commission, Mayor, and other high ranking City officials knew of, ignored, and tolerated the harassment. As such, we are persuaded that the jury's conclusion that sexual harassment was so persistent and widespread as to amount to a unconstitutional policy or custom is amply supported by the evidence.

The workplace was permeated with vulgar, demeaning, and sexually suggestive conversations about women, improper demands for sexual favors and dates, unwelcome sexual advances, as well as unfair treatment for those women unwilling to reciprocate such conduct and who were not considered "team players." *Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180, 1187-89 (7th Cir.1986)(finding policy or custom of sexual harassment at municipal fire department where female employees subjected to unwelcome touching, conversations at the workplace were filled with "lurid sexual descriptions," the department had no sexual harassment policy, management personnel "knew the general picture if not the details" of the pattern of sexual harassment, and complaints were addressed superficially or not at all). We detail much of the testimony presented to the jury to make clear the egregious and commonplace nature of the harassment at the City, as well as to demonstrate that the final policymakers, including the City Commissioners and the Mayor were aware of the problem and were completely indifferent to it.

At trial, several witnesses testified about repeated instances during which Neal and other male employees engaged in vulgar, sexually suggestive, and demeaning conversations describing their sexual escapades and desires. Neal was often overheard discussing his sex life in front of various department heads and other City employees, including women, detailing how great he was in bed and how many times he had sex the night before. In addition, Neal and other male employees would frequently compare female staff members' breasts, legs, and bodies and describe what they would do to the women sexually if they had them.[13] For example, Neal would say "If I had [Jane Doe], I could really rock her world." On one occasion, Neal told the City Attorney that he wanted to see a female employee from the finance department naked. On another occasion during a business meeting at a local hotel with several City employees and representatives from a

---

[13]According to Mayor Ingram, this is just how men talk among themselves.

firm looking to do business with the City, Neal told everyone how he had sex in all of the rooms with mirrors at the hotel. Following a City Commission meeting, Neal talked about going out "poking all night," and high-fived the male assistant city manager who was present. On another occasion, Neal described to a female employee an incident in which he had sex in the back of a patrol car.

The City Attorney, Griffin, and numerous other female employees also testified that Neal frequently asked them for dates or dinner despite their rejections. In addition, he asked them to cook for him, told them that they owed him something, and questioned them about their sex lives. On at least two occasions, a group of female City employees complained to the City Attorney that they were having problems with Neal making inappropriate sexual comments to them, touching them, asking for sexual favors and punishing those who refused, giving people raises when they did not deserve them, and showing favoritism. The City Attorney also received complaints from a City Clerk to the effect that Neal was asking her out, questioning her about who her lover was, and that he was giving her a hard time because she was not reciprocating his advances.

Several employees, including a Commissioner, testified that in reference to Griffin, they knew that Neal had requested that the "big breasted" or "big tit girl" work in his office. Neal asked the City Attorney to go to a nude bar with him and told her that he would like to see her drunk. Natacha Yacinthe, an administrative assistant, testified that Neal asked her details about her sex life, inquired whether she had slept with another City employee, and indicated to her that he wanted her to dress more provocatively. Ana Otero, the acting director of human resources, testified that on one occasion, Neal came up so close behind her while she was standing at a copy machine that she could feel his breath on her neck. Neal told Otero that he liked short, Puerto Rican women like herself, and according to Otero, came up and kissed her once in the elevator though she had done nothing to encourage it. Otero also described an incident where Neal summoned her to his office and asked her for an "intimate kiss."

Griffin, Irby, Ellis, and others testified that Neal made threats regarding their job or salary when they did not reciprocate his advances. Irby testified that Neal told her she'd be removed from her job because she was not "committed to him" and did not ask him out for dinner. Those who did not at least tolerate his advances were not considered team players. One woman who interviewed with Neal for a job at the City testified that Neal commented how nice her legs were, called her at home, asked for dates, talked about kinky sex, gave her a City credit card number and told her to get them a hotel room. She refused his advances and did not get the job.

Moreover, there is no question that the Mayor and City Commissioners knew about Neal's sexual

harassment and misconduct. Commissioner Barrett testified that it was commonly known throughout the City that Neal had problems with sexual harassment and dealing with women both before he became City Manager and afterwards. First, at or around the time Neal was being considered for the permanent City Manager position, various faxes, articles, and cartoons addressed to the Mayor and City Commission were circulated throughout the City government warning that Neal had a problem with sexual harassment. Some of the articles apparently pertained to an incident involving sexual harassment at Neal's previous job. Another fax contained a list of sexual harassment charges against Neal. Other faxes included cartoons depicting a man harassing or assaulting a woman with a warning that "You are going to get this if you hire this guy." A City resident also tried to present these articles and faxes raising concerns about Neal's sexual harassment problems at a City Commission meeting where Neal's hiring was discussed. The resident was ignored.

There was also testimony that Neal was known as a womanizer.[14] Commissioner Barrett testified about a tape recording of a City Commission meeting with Mayor Ingram, the City Commissioners, and the City Attorney where the group erupted in laughter as Neal was repeatedly introduced as Earnie P. Neal. Commissioner Barrett explained that everyone laughed at the emphasis placed on Neal's middle initial because he was known as Earnie "Penis" Neal.[15] At least two employees, including the City Attorney, complained to Commissioner Barrett about Neal's sexual harassment. In addition to the complaints to Commissioner Barrett, another female employee testified that she complained about Neal's behavior to two other Commissioners, the City Attorney, and the Mayor. Although Commissioner Barrett testified that he believed the City had a sexual harassment problem, no remedial action was ever taken. Barrett maintained that he never pursued removing Neal because he believed that the other Commissioners and the Mayor endorsed everything Neal did and would not vote to remove him no matter what.

The most egregious example, however, of the City's notice of sexual harassment and its complete

---

[14]There was testimony that it was known around the City that Neal had a sexual interest in Griffin. Griffin testified that on a least two occasions, Neal made reference to taking her out in the presence of other City officials. She described one incident where Neal summoned her, and in the presence of the Vice-Mayor, told her that he was glad she was going to a City function that night so that they could dance "close together." She testified that both Neal and the Vice-Mayor laughed at the comment and sent her back to her desk. In addition, when Neal told Griffin that he, not the police chief, would take her home following the Rotary Club function, Neal commented in the presence of several Commissioners and the Mayor that he "could take her out now." The City officials laughed at Neal's remark according to Griffin even though there was testimony that Griffin looked upset.

[15]The director of human resources testified that she had heard talk around the City about an orgy that had allegedly taken place involving several City employees, including Neal.

indifference to the problem is evidenced by the testimony regarding the Mayor's response to complaints that Neal was sexually harassing several female employees. Patricia Ellis, the City Attorney, testified that she went to see Mayor Ingram specifically to advise him of the various sexual harassment and misconduct complaints she had received from female employees in regard to Neal. After advising the Mayor of the complaints, Ellis testified that the Mayor responded as follows:

> Heck, if I believe the rumors that I hear about Earnie Neal and Timothy Holmes, then they have a heck of a libido, and I want some of what they are taking.[16]

Other than his statement regarding his desire to take some of what Neal and Holmes were taking, the Mayor had no other response to the harassment complaints and no remedial action was taken. The Mayor's statement is important to our decision today for several reasons. First and foremost, it constitutes the most egregious statement of gross indifference to sexual harassment of which this Court can conceive. For the mayor of a city to express an interest in getting in on the action when confronted with complaints of sexual misconduct by the city's chief executive officer is nothing short of reprehensible.

Second, the Mayor's statement suggests that he was aware of and had prior notice of sexual harassment and/or sexual misconduct involving not only Neal, but the Vice-Mayor as well. The jury was certainly entitled to infer from the Mayor's response that he had prior notice. This inference coupled with the fact that he took absolutely no remedial action and expressed an interest in "taking some of what [Neal and the other Commissioner] are taking" reasonably supports the conclusion that sexual harassment was tolerated and condoned at the City, if not encouraged.

In contending that it had no notice of the harassment, the City makes much of the fact that no prior lawsuits were filed against Neal for sexual harassment. Nevertheless, we do not believe that the absence of prior lawsuits or EEOC complaints is determinative on the issue whether the City is on notice of blatantly unconstitutional conduct by its high-ranking officials. Nor are we overly concerned with the lack of formal complaints within the City government either. The City did not have a sexual harassment policy, nor was there any specific person or entity designated to receive sexual harassment complaints.[17] The lack of a sexual harassment policy or formal mechanism for complaints was particularly problematic in the instant case because Neal, the primary harasser, was the person in charge of personnel and the day-to-day functioning of

---

[16]Timothy Holmes was the City's Vice-Mayor and a member of the City Commission.

[17]Dr. Hattie Daniels, the director of human resources, knew that the City needed a sexual harassment policy. She apparently presented a draft policy to Neal, but no action was ever taken to implement it.

the City. Neither the Mayor or Commissioners were at the City full-time, and apparently there was no one at the City on a daily basis superior to Neal. Under these circumstances, it is not surprising that the City received no formal complaints against Neal.

In sum, we believe that the Mayor and City Commissioners were on notice of Neal's unconstitutional behavior and failed to take the first remedial measure or preventative step to correct the known or suspected sexual harassment problem. *Depew v. City of St. Marys, Georgia,* 787 F.2d 1496 (11th Cir.1986)(city's knowledge of prior complaints, its failure to take remedial action, and lack of inclination to remedy pattern of known constitutional violations is precisely the type of informal policy or custom that is actionable under § 1983). The City never investigated the allegations of sexual harassment, no records were kept of complaints, and no one in charge ever questioned, disciplined, or even discussed sexual harassment with Neal.[18] There was no sexual harassment training or evidence that the Mayor or Commission ever even considered formulating a sexual harassment policy until after Griffin left her job with the City.[19] We believe it fair to say that the City's tolerance of gross sexual harassment, its failure to take remedial action despite actual and constructive knowledge of the problem and its complete lack of any sexual harassment policy or complaint procedure taken together clearly constitute a "moving force" behind the rampant sexual harassment at the City. As such, we uphold the jury's conclusion that the City had a policy or custom of ignoring or tolerating gross sexual harassment.

The more difficult question is whether when a City has such a policy it can be liable for a rape following this type of harassment. Under the facts of this case, however, we do not believe that we are required to answer this question. Upon review of the district court's instructions to the jury and the jury verdict form itself, it appears that the jury did not make the requisite findings to support § 1983 liability for the rape against the City.[20] Specifically, in response to Question 6 of the verdict form, the jury concluded that

---

[18]Two employees did apparently warn Neal about his behavior. Upon hearing Neal's request that the "big tit girl" be sent to his office, Winston Mottley told Neal that "those tits are going to get you in trouble." The City Attorney also warned Neal that his conduct could create problems for the City.

[19]Furthermore, it appears that when the City finally implemented a sexual harassment policy in 1998, it was the new City Manager, not the City Commission, that enacted the policy as part of an administrative regulation.

[20]Moreover, it appears from the verdict form that the jury found the City's maximum liability to be $500,000 in response to Question 9 on the verdict form, which asked the jury to determine what damages were caused by Neal *or* the City for acts other than the rape. In contrast, Question 8 on the verdict form, which required the jury to determine what damages were caused by Neal's sexual assault of Griffin, made

the City had a policy or custom of allowing a sexually hostile or abusive work environment. The jury, however, rendered no express finding as to whether the City had a similar custom or policy of ignoring or tolerating rape or sexual assault. Nor did the jury verdict refer to the rape incident as part of the policy or custom of sexual harassment such that § 1983 liability for the rape could be sustained based on the custom of harassment. Because the record does not establish that the jury found that the City had a custom or policy of allowing rape or that the rape incident was part of the custom or pattern of sexual harassment, we cannot reasonably say that the jury found all essential aspects of the § 1983 case against the City.[21] As such, the verdict and judgment against the City for the rape cannot stand.

### b. Liability for Sexual Harassment

Next, the City contends that it cannot be liable for sexual harassment because the evidence affirmatively established that the atmosphere in which Griffin worked did not constitute a hostile working environment under Title VII or § 1983. To prevail on a hostile environment claim, a plaintiff must demonstrate that the sexual harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment. *Gupta v. Florida Board of Regents,* 212 F.3d 571, 582 (11th Cir.2000), *cert. denied,* --- U.S. ----, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001).

Our discussion in previous sections of the opinion leaves little doubt as to our belief whether Neal's sexual harassment of Griffin was sufficiently severe or pervasive to constitute a hostile working environment. We clearly believe that it was, and the issue merits little discussion.

Construing the evidence in a light most favorable to Griffin, a reasonable jury could conclude that the harassment was severe and pervasive where there was testimony that it was known around the workplace that Neal had a sexual interest in Griffin; Griffin went to work with Neal in the first place because he demanded that the "big tit girl" work in his office; he repeatedly asked her to go on dates with him; cook for him, and to be his girlfriend; he made comments of a sexual nature and insulting remarks about her body, weight, and appearance; constantly requested hugs so that he could feel her breasts and look down her shirt;

---

no reference to the City or its liability for the rape.

[21]Griffin argues that the City is properly liable for the rape because the rape was the culmination of, and therefore part of, the pattern of gross sexual harassment that existed at the City. By our decision today, we do not preclude the possibility that under some facts, a rape or sexual assault could be part of a pattern or custom of sexual harassment. Rather, we simply cannot say based on the record before us in this case that the jury, in fact, made this finding. It appears to us that the jury was never asked to do so.

rubbed his knee against her buttocks and whispered that he was still looking for a girlfriend; and finally, after her repeated rejections of his advances, he raped her. *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1212-16 (D.N.J.1984)(plaintiff stated claim for sexual harassment under § 1983 where she alleged that her supervisor subjected her to crude sexual advances and comments and that same supervisor sexually assaulted her in a state-owned vehicle en route to a work-related meeting); *Woerner v. Brzeczek,* 519 F.Supp. 517, 520 (N.D.Ill.1981)(plaintiff stated § 1983 claim for sexual harassment where she alleged that her supervisor subjected her to embarrassing and belittling remarks in front of fellow officers, repeated sexual advances, and interception of her phone and email messages). *Bohen,* 799 F.2d at 1182-83 (§ 1983 plaintiff was victim of sexual harassment where she subjected to obscene comments by male co-workers and supervisor and forced to listen to "dirty talk" regarding the men's sexual fantasies and their preferences for sexual positions).

### c. Deliberate Indifference

Next, we consider whether a reasonable jury could conclude that the City's alleged deliberate indifference in hiring Neal by failing to investigate his background can support liability for sexual harassment under § 1983. In cases where a plaintiff presents a § 1983 claim based on a hiring decision and inadequate screening, the Supreme Court has stated that:

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 411, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997).

To impose § 1983 liability based on a hiring decision, a plaintiff must demonstrate that the municipal actor disregarded a known or obvious consequence of hiring the applicant. It is not sufficient under this standard that a municipal actor's inadequate screening of an applicant's record reflects an "indifference" to the applicant's background. *Id.* at 411, 117 S.Ct. at 1392. Rather, a plaintiff must demonstrate that the municipal hiring decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. *Id.*

Construing all inferences in favor of Griffin, we believe the evidence was sufficient for a finding that the City's inadequate screening of Neal's background was so likely to result in sexual harassment that the City could reasonably be said to have been deliberately indifferent to Griffin's constitutional rights. Neal was hired as City Manager according to some testimony without a resume, interview, background check, or any

discussion of his qualifications.[22]  As detailed in previous sections of the opinion, at the time when the City was considering hiring Neal, it was inundated with articles, faxes, and mail, warning of Neal's problems with sexual harassment and dealings with women.  There was testimony that some of the faxes included a list of prior sexual harassment charges against Neal. Other faxes included explicit warnings that the City was going to have a sexual harassment and/or sexual assault problem if it hired Neal. Both a citizen who attempted to raise these complaints at a City Commission meeting and a City Commissioner who, concerned about the sexual harassment red flags, requested more information on Neal's background, were disregarded.  Moreover, there was testimony that Neal was a known womanizer, commonly known to the Mayor and Commissioners as Earnie "Penis" Neal.  Most importantly, however, there was testimony suggesting that the City officials were aware that Neal was sexually harassing City employees during the period of time between his appointment as acting City Manager and the time of his final confirmation as permanent City Manager. Despite these red flags indicating that Neal would have problems with sexual harassment, the City hired Neal for a permanent position.

Moreover, it appears that a cursory check into Neal's prior employment history would have further alerted the City to prior complaints about Neal with regard to sexual harassment.  The City apparently ignored its own policy of telephoning prior employers to conduct a background search and did not obtain Neal's employment files prior to hiring him as permanent City Manager.  Neal's file indicated that during his employment with Florida City, there were complaints of sexual harassment against him.  Further, the Mayor of Florida City testified that if he had been contacted by anyone at the City, he would have informed them of the sexual harassment complaints against Neal. Because we believe that the evidence supports the conclusion that the City ignored a known or obvious risk that Neal was highly likely to engage in sexual harassment if hired as the City's permanent City Manager, we uphold the jury's conclusion that the City acted with deliberate indifference in hiring Neal. The City is therefore properly liable for sexual harassment committed by Neal.

### 2. New Trial

Like Neal, the City argues that it is entitled to a new trial because the district court abused its discretion in allowing testimony of certain witnesses and by permitting evidence of Neal's prior bad acts for

---

[22]Mayor Ingram said that no particular experience was necessary for the job and the only qualifications needed were three votes [by the Commission].

the purpose of showing bad character or propensity. We reject the City's arguments that it is entitled to a new trial based on the testimony of Joanne Jefferys and Dr. Fitzgerald for the same reasons we rejected Neal's arguments, and the issue merits no further discussion. We do take a moment, however, to address the City's argument that the district court abused its discretion in permitting evidence of Neal's prior bad acts to show bad character or propensity. Griffin presented evidence that Neal had harassed other women both prior to and during his employment with the City. The City contends that this amounted to little more than a smear campaign against Neal and had no relevance regarding whether Neal harassed or assaulted Griffin. What the City fails to recognize, however, is that the evidence of Neal's prior bad acts was directly relevant to Griffin's claims that the City had a custom or policy of condoning sexual harassment and that the City was deliberately indifferent in hiring Neal.

Neal's prior acts of sexual harassment at other jobs of which the City was aware or should have been aware is critical to the determination whether a reasonable background investigation would have made it plainly obvious that Neal would sexually harass female employees if hired by the City. In addition, the evidence of other acts of harassment was also admissible to demonstrate the City's custom or policy of tolerating sexual harassment. *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.1987)(evidence of prior police brutality action, arrest quotas, and prior incidents of sexual harassment and discrimination were admitted not to prove defendant's bad character, but rather to support "condoned custom" theory of liability against the city). Although as the City contends, the instant case concerns whether Neal sexually harassed or assaulted Griffin, in its *Monell* dimensions, Griffin's complaint raises the larger issue of the City's custom of condoning or tolerating sexual harassment. *Id.* at 1401. As such, the issue of municipal liability allows for a broad inquiry into other allegations of harassment at the City and the City's investigation, attitude, and response to such incidents.

Finally, we do not believe that the prejudice of admitting such evidence outweighs its probative value under Fed.R.Evid. 403. In fact, but for the introduction of evidence of other acts of sexual harassment, this Court cannot see how Griffin would be expected to prove her allegation that the City had a custom or policy of condoning harassment or that the City ignored a known risk that Neal would sexually harass women if he was hired as the City Manager.

### 3. Remittitur

Finally, the City argues that the district court clearly abused its discretion in refusing to hold that the

damage awards of $500,000 for sexual harassment and $1,500,000 for the rape were excessive.[23] Nevertheless, our review of a trial court's decision whether to remit a jury's award of compensatory damages is highly deferential. We have held that "[o]nce a defendant is found liable for the plaintiff's injury, the district court has a great deal of discretion in deciding the level of damages to be awarded." *Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 476 (11th Cir.1999) (*citing Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985)); *Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1447-48 (11th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985)(reviewing trial court decision as to whether jury compensatory damages award was excessive for "clear abuse of discretion"); *Agro Air Associates., Inc. v. Houston Casualty Co.,* 128 F.3d 1452, 1455 n. 5 (11th Cir.1997)(reviewing denial of motion for remittitur or new trial on ground of excessive damages under abuse of discretion standard). We are particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so "subjective and evaluating it depends considerably on the demeanor of the witnesses." *Ferrill,* 168 F.3d at 476.

In the instant case, the jury reached its decision regarding the proper amount of damages after testimony from Griffin and others regarding the devastating personal impact the sexual harassment and rape had on her physical and mental state. Griffin suffered from a major depressive disorder, gained significant weight, and continues to experience the emotional repercussions of the rape and harassment. The district court instructed the jury that emotions and sympathy were not to play any role in their deliberations and that compensatory damages were not allowed as punishment. Absent evidence to the contrary, we presume that juries follow the law as instructed. *Raulerson,* 753 F.2d at 876. As such, we do not believe the district court abused its discretion in refusing to grant a remittitur.

IV. Conclusion

We hope that this is a unique case. It is difficult to believe that mature responsible adults would conduct themselves in this manner. It is even more troubling when the perpetrators of such intolerable activity are municipal officials. Our decision today should serve as a clear message to all that this type of behavior is contrary to our laws and will not be tolerated. For all of the foregoing reasons we affirm the verdict and judgment against Defendant Neal in all respects. We reverse the $1.5 million verdict against the

---

[23]In light of our determination that the City is not liable for Neal's sexual assault of Griffin, the $1.5 million in damages for the sexual assault is inapplicable as against the City.

City for Neal's sexual assault of Griffin under § 1983, but affirm the judgment against the City in all other respects.

AFFIRMED in part and REVERSED in part.

ANDERSON, Chief Judge, concurring specially:

I concur in all of Judge Fay's opinion in this very disturbing case, except to the extent that the opinion addresses the issue of whether Neal was acting under color of state law when he assaulted and raped Griffin. This issue was raised only by the City.[1] Because we hold that the jury did not find the City liable for the rape, there is no need to address the City's challenge relating to whether or not Neal was acting under color of law at that time. The jury found the City liable under § 1983 only for $500,000, and only for acts other than the rape (i.e., the sexual harassment excluding the rape). With respect to that issue, Judge Fay's opinion clearly establishes both that Neal acted under color of law and that he acted pursuant to a policy or custom of the City.

---

[1]The probable explanation for Neal's failure to raise the issue is because Neal was liable for the rape under several theories, including the state law claim of assault and battery.