[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13151

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 25, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-81128-CV-DTKH

ADVANCED BODYCARE SOLUTIONS, LLC,

Plaintiff-Counter-
Defendant-Appellant,

versus

THIONE INTERNATIONAL, INC.,

Defendant-Counter-
Claimant-Appellee,

NATURECITY, LLC,
CARL PRADELLI,

Third Party-Counter-
Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 25, 2010)

Before TJOFLAT, WILSON and EBEL,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

This case arises out of a contract that required a company to make minimum purchases of products in exchange for an exclusive license to market and distribute them. Contending that products it initially received were defective, the purchaser did not make the additional minimum purchases the contract required. After attempts to negotiate a solution to the parties' differences failed, the purchaser brought suit against the supplier for breach of contract and for breach of an implied warranty. The supplier counterclaimed, seeking the profits it would have earned had the purchaser satisfied its obligations under the contract. A jury found for the supplier on the purchaser's claims and awarded it $2.5 million on its counterclaim.

The district court entered judgment for the supplier for $2.5 million and denied the purchaser's post-judgment motions for judgment as a matter of law and, alternatively, a new trial. The purchaser now appeals. We affirm.

I.

A.

---

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

On April 1, 2004, Advanced Body Care Solutions, LLC ("Advanced") and Thione International, Inc. ("Thione") entered into a Supply and Licensing Agreement (the "Licensing Agreement" or "Agreement"). This Agreement required Advanced to make minimum purchases of "Thione Antioxidant Complex" (the "Dietary Supplement"), which reduces free radical damage to the body, and Thione's "Free Radical Monitor Test Kit" (the "Test Kit"), which is a test kit for at-home use to monitor the body's free radicals.[1] The Test Kits could be purchased as a whole or by their three components, one of which was free radical monitor ampoules.[2] In exchange, Advanced received, for the duration of

[1] Advanced could choose the ratio in which it purchased the Dietary Supplements and Test Kits, so long as it spent a certain amount on the products each quarter for the duration of the Licensing Agreement. The amounts that Advanced was required to spend are shown in the chart below.

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
|  | Jan. 1st–Mar. 31st | April 1st–June 30th | July 1st–Sept 30th | Oct 1st–Dec. 31st |
| 2004 | XX | XX | XX | $201,450.00 |
| 2005 | $268,600.00 | $335,750.00 | $537,200.00 | $537,200.00 |
| 2006 | $537,200.00 | $537,200.00 | $537,200.00 | $537,200.00 |
| 2007 | $537,200.00 | $550,000.00 | $550,000.00 | $550,000.00 |
| 2008 | $550,000.00 | $550,000.00 | $555,000.00 | $555,000.00 |
| 2009 | $555,000.00 | XX | XX | XX |

[2] Ampoules are small glass tubes containing a clear liquid reagent, which tests for the presence of free radicals in a urine sample.

the Agreement, "the license and authority" "to advertise, promote, market, sell and otherwise distribute" the Dietary Supplement and the Test Kit on an exclusive basis. The Licensing Agreement was to remain in effect for a minimum of five years: April 1, 2004 to March 31, 2009.[3]

> The Licensing Agreement provided that either party could terminate the
>
> Agreement upon thirty (30) days written notice thereof to the other party upon the breach by the other party of any of its material representations, warranties, covenants, or agreements contained in this Agreement. Upon the expiration of such notice period, this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the terminating party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect. Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.[4]

Thione could also terminate the Agreement early on additional grounds, including if Advanced failed to make any of the minimum purchases the contract required. In that event, as provided in Paragraph 6B, the Agreement and the exclusive

---

[3] The Agreement provided that it would automatically extend for additional one-year periods unless either party provided 60 days advance notice of termination.

[4] Although there are no warranty claims on appeal, we note that the Licensing Agreement warranted that the Test Kits and Dietary Supplements provided under the Agreement would be free of defects for 180 days. If they were not, Advanced could return them, and Thione would have the option of replacing the units or refunding the purchase price for the returned units.

4

license granted to Advanced would,

> as of such date, at the sole and absolute discretion of Thione: (1) be terminated; (2) be re-negotiated with respect to price, duration or similar aspect; or (3) be changed from an "exclusive" license to a "non-exclusive" license for the balance of the term of this Agreement . . . . Notwithstanding the foregoing, prior to exercising any of the afore-mentioned rights, Thione shall provide [Advanced] with thirty (30) days prior written notice to remedy any purchase deficiency and if [Advanced] cures such minimum dollar order shortfall within such 30 days period, the exclusive license shall remain intact.

Although Advanced was not required to meet a minimum purchase amount until the fourth quarter of 2004, it had to place its initial order within thirty days of the execution of the Agreement.[5] Finally, the Agreement would be governed by Georgia law.

On May 26, 2004, Advanced placed an order for 25,000 ampoules, for which it paid $41,250. It received about 20,000 ampoules on September 1. It was immediately apparent that 200–300 of the 20,000 were broken, and about 1,000 were pink, indicating that they were defective.[6] The following day, Dr. Stephen Perry, Advanced's liaison with Thione, sent an email to Dr. Mark Hersh, the CEO and chief scientist of Thione, stating that, "Carl [Pradelli, Advanced's managing

---

[5] The Agreement required that the initial order be paid in full with the purchase order; for subsequent orders, only 50% had to be paid with the purchase order.

[6] As stated in note 2, supra, the ampoules are supposed to contain a clear liquid reagent. If the ampoules turn pink before being used by the customer, they are defective.

member,] received some vials that are pink," and inquiring, "Do we have a production issue?" Advanced received the outstanding 5,000 (of the 25,000) ampoules on November 9. At the end of 2004, Advanced was $144,900 short on its minimum purchase obligation of $201,450 for the quarter.[7]

On January 7, 2005, Advanced made a payment of $72,450 to Thione—half of the balance due on the previous quarter's minimum payment. Advanced did not specify what it sought to purchase; rather, an accompanying email from Pradelli to Hersh stated that the amount of the wire was "for $72,450 representing a 50% deposit on a $144,900 purchase order. We previously purchased $56,550 worth of product, the current [purchase order] gets us to the 2004 threshold of $201,450. I hope to get specifics on the number of ampoules versus [the Dietary Supplement] in the next 10–14 days."

As of March 2005, Thione had not yet identified the source of the problem with the first shipment of 20,000 ampoules, and Advanced had placed no subsequent orders.[8] On March 18, Pradelli sent Hersh a "summary report of

---

[7] The License Agreement provided that "[a]ll orders for Products received prior to December 31, 2004 shall be applied to the 4th Quarter 2004 minimums." In addition to the $41,250 spent on the ampoules, Advanced had paid $15,300 for the Dietary Supplement.

[8] Advanced neither paid the remaining balance on the minimum purchase order for the fourth quarter of 2004 nor specified what products it sought to receive with the $72,450 deposit. As a result, Thione did not ship Advanced any products for the $72,450.

[Advanced's] marketing efforts for" the Test Kit. Following five pages on that subject was a section of the letter entitled "The Lingering Black Cloud." This section asserted and stressed that Advanced's "biggest concern" was the defective ampoules and that it could not launch any additional marketing initiatives until satisfied that the problem was permanently solved. Following the receipt of this letter, Hersh sent an email to Pradelli on March 28. In the email, Hersh acknowledged that 1,440 of the initial 20,000 shipped were defective and told Pradelli that they would be replaced. After Pradelli responded that 4,000 ampoules had turned pink, Hersh asked Pradelli to return these ampoules and offered to send replacements immediately. He also assured Pradelli that the problem had been identified and all of the ampoules other than those received in the initial shipment of 20,000 were fine. Pradelli then replied that the problem went beyond the 4,000 defective ampoules; as ampoules were continuing to turn pink, he could not tell how many would ultimately prove defective. Pradelli did not return the defective ampoules, but Thione sent Advanced 6,700 replacement ampoules in November 2005.

During the summer of 2006, Advanced and Thione attempted to renegotiate the Licensing Agreement. The renegotiation efforts failed.

B.

7

On September 26, 2006, Advanced filed suit against Thione for damages in the Circuit Court of Palm Beach County, Florida. In its complaint, Advanced claimed that Thione had breached the Licensing Agreement and an implied warranty by providing Advanced with defective ampoules.[9] Thione timely removed the case to the Southern District of Florida,[10] and after the district court denied its motion to dismiss the action, Thione answered Advanced's complaint and filed a counterclaim. The answer denied that Thione breached the Licensing Agreement and any implied warranty. The counterclaim alleged that Advanced breached the Agreement by failing to make the minimum purchases the Agreement required and that Thione was entitled to recover the profits it would have earned had Advanced made the purchases.[11] Advanced's answer to Thione's counterclaim denied the breach. The answer also asserted that Thione's breach of

---

[9] The complaint also asserted claims for breach of an implied covenant of good faith and fair dealing, conversion, and civil theft. These claims were disposed of adversely to Advanced prior to the submission of the case to the jury and are not at issue here.

[10] Thione removed the case pursuant to 28 U.S.C. § 1441(a) on the ground that the district court had original jurisdiction of the action under 28 U.S.C. § 1332(a)(1).

[11] Thione also counterclaimed for "trademark infringement," "unfair competition," and "false advertising and deceptive trade practices" under the Lanham Act, 15 U.S.C. § 1125(a), and for the "violation of [the] right of publicity" under Fla. Stat. § 540.08 and common law. Thione also asserted these claims against Carl Pradelli and Nature City, LLC; Thione joined these parties in the counterclaim under Fed. R. Civ. P. 13(h) and 20(a)(2)(B). All of these claims were disposed of adversely to Thione (the jury found against Thione on the trademark infringement and false advertising claims) and are not at issue here.

8

the Agreement relieved Advanced of its minimum purchase obligations and, addressing Thione's claim for lost profits, alleged that Thione had failed to mitigate the loss.

Prior to trial, Advanced moved the district court in limine to prevent Thione from presenting any evidence of lost profits to the jury on two alternative grounds: (1) the Agreement, by its terms, precluded the recovery of lost profits; and (2) the testimony of the witness Thione planned to call to calculate the loss, Dr. Robert D. Coston, an economics professor, could not qualify as expert testimony. The court denied the motion without prejudice to Advanced's right to object to the introduction of such evidence at trial.

On April 14, 2009, the case proceeded to trial on Advanced's claims for breach of contract and implied warranty and Thione's counterclaim for breach of contract. Advanced presented testimony relating to the circumstances surrounding the execution of the Licensing Agreement, its subsequent receipt of the defective ampoules, and the steps it took to have Thione remedy the problem. Then, after calculating the damages it incurred as a result of Thione's alleged breaches, some $2.075 million, Advanced rested its case.

Thione, in its case, presented evidence to support its view of the parties' respective performances of the Agreement, and, over Advanced's renewed

9

objection to the admissibility of his anticipated testimony, called Dr. Coston to the witness stand to establish the profits Thione would have earned had Advanced made the purchases the Agreement required it to make through the life of the Agreement. Using the minimum purchases the Agreement required Advanced to make through the first quarter of 2009, which totaled about $9 million,[12] Coston subtracted Thione's costs of goods and expenses and arrived at a net profit loss of around $4.7 million.

After the evidence closed, on April 24, the district court noted for the record that Advanced wanted to move the court for judgment as a matter of law (pursuant to Federal Rule of Civil Procedure 50(a)) and then sent the case to the jury;[13] Advanced could present its motion, and the court would rule on it, while the jury was deliberating. As Advanced was preparing to proceed, however, the jury returned its verdicts. It found in favor of Thione on all of Advanced's claims and awarded it $2.5 million on its breach of contract counterclaim.

After polling and then discharging the jury, the court invited Advanced to proceed. Advanced moved for judgment as a matter of law on its breach of

---

[12] See supra note 1.

[13] The court did so, it said, because "the trial had gone on longer than we anticipated [and] we had jurors who had indicated travel plans and other matters." Trial Tr., vol. 14, at 1638.

contract claim and Thione's breach of contract counterclaim. Advanced argued that it was entitled to judgment on the grounds that Thione had materially breached the Licensing Agreement and the contract barred the recovery of lost profits. As an additional ground for judgment on the counterclaim, Advanced argued that Dr. Coston's testimony lacked probative value and thus should be stricken from the record.

The district court denied Advanced's motions. The court then set May 20 as the deadline for filing post-trial motions; thereafter, on May 4, the court entered a final judgment for Thione in accordance with the jury's verdicts.

On May 20, Advanced moved the district court pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on its breach of contract claim and Thione's counterclaim. Advanced moved alternatively pursuant to Federal Rule of Civil Procedure 59(a) for a new trial on the damages element of Thione's counterclaim.[14] The court denied these alternative motions on May 22, and on June 16, Advanced filed a notice of appeal. The notice stated that Advanced was appealing the final judgment entered on May 4 and the district court's denial of its post-trial motions on May 22. We have jurisdiction over the

_____

[14] Advanced also moved the court pursuant to Fed. R. Civ. P. 59(e) to alter and amend its judgment.

appeal of the post-trial motions pursuant to 28 U.S.C. § 1291 but, as indicated in

the margin, not the final judgment.[15]

---

[15] Thione contends that we lack jurisdiction to entertain Advanced's appeal because it was not filed within 30 days of the entry of the judgment. See Fed. R. App. P. 4(a)(1)(A). A timely motion filed pursuant to Fed. R. Civ. P. 50(b) or 59—that is, no later than 10 days after the judgment is entered, see Fed. R. Civ. P. 50(b), 59 (2009)—tolls the time for appealing the judgment, Fed. R. App. P. 4(a)(4)(A). Advanced's Rule 50(b) and Rule 59(a) and (e) motions were not filed within 10 days of the judgment's entry, however, and, thus, as Thione correctly points out, they did not toll the time for appealing the judgment.

"[T]he timely filing of a notice of appeal in a civil case is a jurisdictional requirement." Bowles v. Russell, 551 U.S. 205, 214, 127 S. Ct. 2360, 2366 (2007). It is a jurisdictional requirement because "[t]he time limits in Appellate Rule 4(a) are based on the statutory time limits for filing a notice of appeal found in 28 U.S.C. § 2107." Green v. DEA, 606 F.3d 1296, 1301 (11th Cir. 2010). Restrictions on a district court's authority to extend a filing deadline, however, are another matter. An example of such a restriction is found in Federal Rule of Civil Procedure 6(b)(2), which prohibits a district court from extending the time for filing motions under Rules 50(b) or 59. Rule 6(b) is not grounded in a statutory requirement. Rule 6(b) is therefore classified as a claims-processing rule rather than a jurisdictional rule. See Kontrick v. Ryan, 540 U.S. 443, 454–56, 124 S. Ct. 906, 915–16 (2004). While a party cannot forfeit an objection to a court's failure to apply a jurisdictional rule because lack of subject matter jurisdiction is always a valid objection, an objection to a court's failure to apply a claims-processing rule can be forfeited. Id. at 459–60, 124 S. Ct. at 917–18.

In this case, Advanced had 10 days from the entry of judgment on May 4 to file motions under Rule 50(b) and Rule 59. Fed. R. Civ. P. 50(b); 59(a), (e) (2009). Because weekends were excluded in calculating the time period for filing these motions, see Fed. R. Civ. P. 6(a)(2) (2009), the motions had to be filed by May 18. Although the district court attempted to extend the time for filing them until May 20, that attempt was ineffective because Rule 6(b)(2) prohibited the extension. Green, 606 F.3d at 1300. Thus, Advanced's Rule 50(b) and Rule 59 motions were untimely and did not toll the time period for appealing the May 4 judgment. Id. ("Untimely motions under Rules 59 and 60 will not toll the time for filing an appeal." (quoting Advanced Estimating Sys., Inc. v. Riney, 77 F.3d 1322, 1323 (11th Cir. 1996) (per curiam))). As Federal Rule of Appellate Procedure 4(a) is a jurisdictional rule, Advanced's appeal of the May 4 judgment was untimely, and we lack jurisdiction to hear it.

However, since Rule 6(b) is a claims-processing rule, Thione, in failing to object to the district court's violation of the rule (by extending the time for filing post-trial motions) forfeited its objection to the time extension. In light of this forfeiture, the district court had the authority to entertain Advanced's motions. Advanced appealed the district court's order denying the motions within 30 days of the court's entry of the order. Since that appeal was timely, we have jurisdiction to review the district court's May 22 order as to Advanced's post-trial motions.

## II.

Advanced argues that the district court should have granted it judgment as a matter of law on its breach of contract claim and Thione's counterclaim. Advanced also argues that the district court erred in submitting the issue of Thione's lost profits to the jury because the Licensing Agreement foreclosed the recovery of lost profits as a remedy for breach of the Agreement.[16] Assuming that the Agreement allowed the recovery of lost profits, Advanced seeks a new trial because the jury's $2.5 million award for lost profits was based on inadmissible expert opinion testimony and, moreover, was against the great weight of the evidence. In subpart A, we consider whether the court erred in denying Advanced judgment as a matter of law in whole or in part. In subpart B, we consider whether the court should have granted Advanced a new trial on the issue of Thione's damages.

## A.

---

[16] Advanced presents this argument in the context of its Rule 59(e) motion to alter or amend the judgment, but if Advanced is correct in the argument, it would be entitled to judgment on the counterclaim pursuant to Rule 50(b). What Advanced is actually contending is that the district court should not have permitted Thione to present evidence on its lost profits (in accordance with Advanced's objection, raised initially in its pretrial motion in limine), because their recovery was precluded by the Agreement, and accordingly should have struck the lost-profits element of Thione's counterclaim at the close of the evidence. Then, with the lost profits element having been struck from its counterclaim, Thione would have had no other damages to present to the jury, so Advanced would be entitled to judgment. For convenience, we address the objection in subpart A, which addresses Advanced's Rule 50(b) objections.

13

When considering whether or not a ruling on a motion for [judgment as a matter of law] should be upheld, the standard of review to be applied by this Court is the same as that applied by the district court. Thus, we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party.

Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989) (footnotes omitted). We then determine whether, in this light, there was any "'legally sufficient basis for a reasonable jury to find in favor' of the nonmoving party." Brough v. Imperial Sterling Ltd., 297 F.3d 1172, 1177 (11th Cir. 2002) (quoting Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997)).

Advanced argues that the jury lacked a legally sufficient evidentiary basis for finding for Thione on Advanced's breach of contract claim and for Thione on its breach of contract counterclaim for two reasons: (1) Thione's inclusion of defective ampoules in the 20,000 ampoule shipment of September 1, 2004, constituted a breach of the contract as a whole; and (2) Thione thereafter repudiated the Licensing Agreement by failing to provide Advanced with adequate assurances. Consequently, Advanced was relieved of its obligation to make further purchases (after the fourth quarter of 2004).

1.

Pursuant to Georgia law, the Licensing Agreement is an installment contract. "An 'installment contract' is one which requires or authorizes the

14

delivery of goods in separate lots to be separately accepted . . . ." O.C.G.A. § 11-2-612(1). "Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is breach of the [installment contract as a] whole." Id. § 11-2-612(3). Viewing the evidence in the light most favorable to Thione, less than 5,000 of the 25,000 ampoules shipped by the end of 2004 were damaged. Because the Licensing Agreement covered far more than the sale of ampoules, a reasonable jury could find that one order in which less than twenty percent of the goods were impaired did not breach the contract as a whole—especially when the order in question covered only $41,250 of the nearly $9 million contract. Moreover, Advanced never had a problem with the 5,000 ampoules shipped in November 2004 or the 6,700 replacement ampoules shipped in 2005. Given this evidence, the district court properly rejected Advanced's argument that Thione's shipment of the defective ampoules breached the entire Licensing Agreement.

2.

Georgia law provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already

15

received the agreed return." O.C.G.A. § 11-2-609(1). Of course, "[a] party already in breach is not entitled to invoke section 2-609 by demanding assurances." Hope's Architectural Prods., Inc. v. Lundy's Constr., Inc., 781 F. Supp. 711, 715 (D. Kan. 1991) (citing United States v. Great Plains Gasification Assocs., 819 F.2d 831, 835 (8th Cir. 1987)).[17] We agree that "[t]o hold otherwise would allow a party to avoid liability for breaching its contract by invoking 2-609." Id.

By January 1, 2005, Advanced was in breach of the Licensing Agreement because it had not met the minimum purchasing requirement of the last quarter of 2004. Therefore, Advanced would have had to make a valid demand for adequate assurances before that date. The only communication that Advanced points to as a demand for adequate assurances made prior to the end of 2004 is Perry's September 2, 2004 email inquiring whether the pink ampoules meant that there was "a production issue." The district court did not err by declining to rule that, as a matter of law, this simple email inquiry constituted a "writing [that] demand[ed] adequate assurance of due performance," for a reasonable jury could have concluded it did not. See SPS Indus., Inc. v. Atl. Steel Co., 366 S.E.2d 410, 411, 413–14 (Ga. Ct. App. 1988) (declining to rule that a letter demanding immediate

---

[17] O.C.G.A. § 11-2-609 is identical to U.C.C. § 2-609 in all material respects.

16

information on a defective product constituted as a matter of law a demand for adequate assurances, instead characterizing it as "nothing more than a request for information"); see also Automated Energy Sys., Inc. v. Fibers & Fabrics of Ga., Inc., 298 S.E.2d 328, 329–30 (Ga. Ct. App. 1982) (holding that a request for a party to sign financial statements did not constitute a "demand [of] assurance of due performance").

### 3.

Advanced's argument that the Licensing Agreement barred Thione's recovery of lost profits is grounded in Paragraph 6B of the Agreement, which addresses the effect of Advanced's failure to meet the minimum purchase requirements.[18]  Paragraph 6B provided that if Advanced "fail[ed] to order and pay for at least the minimum dollar amount of Products during any applicable period of time," Thione could, "at [its] sole and absolute discretion," terminate or renegotiate the Agreement, or revoke its exclusivity.  Advanced contends that these remedies were the only remedies available to Thione.

The provision in Georgia's commercial code that governs limitation of remedies provides, in relevant part, that subject to certain restrictions, an agreement "may limit or alter the measure of damages recoverable under this

---

[18]  The relevant part of Paragraph 6B is quoted in part I.A, supra.

17

article," but that "[r]esort to a remedy [in an agreement] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." O.C.G.A. § 11-2-719(1).[19] According to the comment to Georgia's enactment of the Uniform Commercial Code, this language "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." O.C.G.A. § 11-2-719 cmt. 2.

The statutory language and comment show a strong reluctance to construe a contractual remedy as exclusive. Courts have shared this reluctance, sometimes refusing to construe remedies as limited—even when they have thought that an exclusive remedy was intended—if the magic words "exclusive" or "sole" remedy were not used and the agreement language did not otherwise "specify that the remedy or remedies provided were to be exclusive of any other remedy which appellant 'might have under the various provisions of the UCC.'"[20] Parsons v. Motor Homes of Am., Inc., 465 So. 2d 1285, 1291 (Fla. 1st Dist. Ct. App. 1985) (quoting Council Bros., Inc. v. Ray Burner Co., 473 F.2d 400, 406 (5th Cir.

---

[19] This provision is identical to the Uniform Commercial Code's provision on limitation of remedy, U.C.C. § 2-719, in all material respects.

[20] The word "sole" appears in Paragraph 6B, but it modifies Thione's discretion, not Thione's remedies.

18

1973)).  Applying these principles, we conclude that because the Licensing

Agreement does not clearly express that the listed remedies are the exclusive

remedies available to Thione, regardless of what the parties' intentions may have

been, the Agreement did not effectively limit Thione's remedies.  Hence, the

district court did not err in allowing Thione's claim for lost profits to go forward.

## B.

Advanced argues that the district court abused its discretion in denying its

motion for a new trial[21] on the issue of damages.[22]  A new trial is warranted, it

contends, because the jury's $2.5 million award (1) was based on expert opinion

testimony that should not have been admitted, and (2) was excessive and therefore

---

[21]  In its opening brief on appeal, Advanced argues that it should receive a new trial on the ground that the court failed to instruct the jury, in accordance with Advanced's request, that if Thione believed that Advanced had breached the Licensing Agreement, it was obligated to send notice to Advanced and give Advanced 30 days in which to cure the breach.  Advanced did not present this ground in its Rule 50(b) or Rule 59 motion.  Thus, since our review is limited to the district court's order denying those motions, as we explain in note 15, supra, we do not consider this argument.

[22]  In addition to seeking a new trial on damages on the grounds set out in the text that follows, Advanced contends that a new trial is necessary because the court failed to include an interrogatory on the jury verdict form asking whether Thione had a reasonable opportunity to mitigate its damages but failed to do so.  We dispose of the argument with this brief comment. The jury did receive an instruction on mitigation of damages, as Advanced properly concedes. Whether the court should have gone one step further and included the interrogatory Advanced proposed in the verdict form was a matter committed to the court's discretion, Worsham v. A.H. Robins Co., 734 F.2d 676, 690 (11th Cir. 1984).  The district court did not abuse its discretion, and in denying Advanced a new trial on the ground that the absence of the proposed interrogatory prejudiced its defense against Thione's counterclaim, the district court may have taken into account the fact that the jury did reduce the amount of lost profits Thione was seeking from $4.7 million to $2.5 million.

19

contrary to "the great weight of the evidence," Williams v. City of Valdosta, 689

F.2d 964, 973 (11th Cir. 1982).[23]

1.

"Our review of the district court's decision to admit [expert] testimony is

very limited" and is reviewed "only for abuse of discretion." Maiz v. Virani, 253

F.3d 641, 662 (11th Cir. 2001). Prior to trial, Advanced moved the district court

in limine to bar Dr. Coston from testifying as an expert on the issue of Thione's

[23] In its opening brief on appeal, under the heading "The Trial Court Erred in Denying Appellant's Motion for Remittitur or to Reduce or Set-Aside Damages Awarded to Appellee," Advanced argues that "[b]ecause the jury's verdict was not supported by competent evidence, it should have been reduced or set aside, or in the alternative, a new trial ordered." Brief at 54–55. We explain in this subpart why competent evidence did support the jury's verdict, but it is also important to explain why the court would be unable to provide Advanced with the primary relief requested—that the district court order a remittitur or itself reduce or set aside the damages.

In a case in which the plaintiff (here, Thione) has recovered a money judgment in accordance with a jury verdict, the district court has the discretion to grant the defendant (here, counter-defendant Advanced) a new trial unless the plaintiff remits a portion of the judgment. Griffin v. City of Opa-Locka, 261 F.3d 1295, 1298 (11th Cir. 2001). In its motion to alter or amend the judgment, see supra, note 13, Advanced asked the court to order a remittitur, but its motion and accompanying memorandum did not ask the court to order Thione to remit a portion of the award or suffer the granting of a new trial. Rather, Advanced asked the court simply to reduce the amount of the $2.5 million awarded to Thione. Because Advanced did not indicate the amount of the remittitur or judgment reduction the district court should have ordered—put another way, since Advanced did not point the district court to a dollar amount that would not be excessive—it is unclear how the district court could have divined such amount.

That leaves the court with the option of itself reducing or setting aside the jury's damages award. We are aware of no authority, in the statutes or the cases, holding that a district judge has the discretion to reduce the plaintiff's money judgment by a sum certain and enter a new judgment in the amount of the difference. Reducing a money judgment in this way could, in effect, deprive the plaintiff of its Seventh Amendment right of trial by jury. See Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1329 (11th Cir. 1999). In any event, the court did not abuse its discretion by denying the post-trial motion.

20

lost profits.  In support of its motion in limine and later at trial, Advanced argued that Coston should not be permitted to testify because his methodology was to calculate Thione's anticipated profits simply by using projected revenue and cost data provided by Thione[24] without verifying beforehand the accuracy of the projected revenue and the underlying data.   Advanced claimed that the projected revenue and underlying data were flawed; they assumed an incorrect ratio at which Advanced would purchase the Test Kits and Dietary Supplement.[25]

We agree with the district court's explanation for denying Advanced's objection to Dr. Coston's testimony—Advanced's arguments went not to admissibility but to "the weight to be attributed to [his] testimony."  Advanced was free to challenge—on cross-examination and on rebuttal—the reliability of

---

[24] In determining the amount of costs to deduct from the revenue generated by Advanced's purchases, Coston relied on expense and pricing data received from Thione.

[25] Advanced also argued that Coston's calculations were flawed because Coston calculated damages from the time of breach, not the date Thione sent Advanced a letter in August 2007 notifying Advanced that it was in breach.  The date of breach was the appropriate period to begin calculating damages—"'[t]he time when performance should have taken place is the time as of which damages are measured.'  In many cases, the appropriate date for calculation of damages is the date of breach."  Energy Capital Corp. v. United States, 302 F.3d 1314, 1330 (Fed. Cir. 2002) (quoting Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958)).  We also note that the date Thione sent the letter of termination is not relevant because Advanced had already brought suit against Thione at that point.  Cf. Solitron Devices, Inc. v. Honeywell, Inc., 842 F.2d 274, 278 (11th Cir. 1988) (explaining that after a party terminates a contract, "a cure notice from [the other party] . . . serve[s] no purpose. . . .  Where the contract has already been terminated by the party allegedly in breach, the [other] party's compliance or lack of compliance with [a] termination clause is irrelevant").

21

the revenue projections and data on which Coston grounded his opinions and thus the weight the jury should ascribe to those opinions.[26] We find no abuse of discretion here.

2.

Advanced's argument that the $2.5 million damages award is excessive and contrary to the great weight of the evidence is based primarily on the assumption that Dr. Coston's testimony should not have been admitted. Having concluded that the court did not abuse its discretion in allowing the testimony, we must conclude that the jury's verdict, which did not exceed the amount of Coston's calculations, was neither against the great weight of the evidence nor excessive.

III.

For the foregoing reasons, we AFFIRM the district court's order denying Advanced's post-trial motions.

SO ORDERED.

---

[26] Advanced cross-examined Coston at length about the data he relied upon and the assumptions he drew from that data. In addition, Advanced called its own expert, William David Ellrich, Jr., in rebuttal, to criticize Coston's opinions.